IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

Nos. 92-3419
92-3613
_____


CARPENTERS DISTRICT COUNCIL OF
NEW ORLEANS & VICINITY, ET AL.,

Plaintiffs-Appellees,
Cross-Appellants,

versus

DILLARD DEPT. STORES, INC., Etc.,
ET AL.,

Defendants-Appellants,
Cross-Appellees.

**********************************************************************
STEPHEN J. PLESCIA, Etc., ET AL.,

Plaintiffs-Appellees,

versus

DILLARD DEPT. STORES, INC., ET AL.,

Defendants-Appellants.
_____
Appeals from the United States District Court for the
Eastern District of Louisiana
_____
( February 22, 1994  )

Before POLITZ, Chief Judge, REYNALDO G. GARZA, and JOLLY, Circuit
Judges.

E. GRADY JOLLY, Circuit Judge:

For the first time, this court is called upon to address the
Worker Adjustment and Retraining Notification Act ("WARN Act"), 29
U.S.C. § 2101 et seq. (Supp. 1993).  It requires some employers--
generally those who are curtailing or closing an operation--to

provide sixty days notice to those employees who will be laid off or whose hours will be substantially reduced. In 1989, D.H. Holmes Co., Ltd. merged with Dillard Department Stores, Inc., resulting in the layoff of a large number of people--mostly former Holmes employees--whose job functions had become redundant. These former employees sued Dillard, alleging that in the course of the ongoing merger efforts, Holmes and Dillard had failed to provide adequate notice of the pending terminations. The district court generally ruled for the former employees and awarded some damages to them. Both Dillard and the former employees appeal, raising various issues that in turn we will address. We begin with the relevant facts.

I

In 1988, as a result of steadily declining profits and revenues, Holmes, a long-established and time-honored retail department store headquartered in New Orleans, Louisiana, hired investment counselors to find a solution to its financial problems. Through the investment counselor's efforts, Holmes and Dillard entered into negotiations in the latter part of 1988 for the merger of the two corporations. A merger agreement was ultimately reached between representatives of the two parties. Under this agreement, Holmes would merge with DDS Acquisitions Corporation ("DDS"), a wholly-owned transient subsidiary of Dillard, with Holmes

continuing as the surviving wholly-owned subsidiary of Dillard.[1]
On March 3 and 6, 1988, the agreement was approved by the
respective boards of directors of both Dillard and Holmes. Still,
it was not yet a done deal. One of the conditions of the agreement
was that no less than eighty percent of Holmes's stockholders must
approve the merger. Before any vote by the stockholders, however,
Dillard and Holmes were required to furnish Holmes's stockholders
with registration statements outlining the parties' respective
financial conditions. Further yet, the Securities and Exchange
Commission ("SEC") required that such registration statements must
be pre-approved by the SEC before issuance. Pursuant to SEC
regulation, Dillard and Holmes filed the proposed registration
statement with the SEC on or about March 7, 1989. Efforts were
made to have the SEC expedite its decision concerning the
registration statement; however, neither Holmes nor Dillard could
anticipate precisely when the SEC would approve the registration
statement. Approximately one month after the statement was filed,
the SEC approved the registration statement. Having received SEC
approval, Holmes then scheduled a stockholders' meeting for May 9,
1989.

---

[1]In corporate tax parlance, this is known as a "reverse
triangular merger." See 26 U.S.C. § 368(a)(2)(E) (Supp. 1993); see
also BORIS I. BITTKER & JAMES S. EUSTICE, FEDERAL INCOME TAXATION OF
CORPORATIONS AND SHAREHOLDERS, § 14.15(1) (5th ed. 1987). See infra
note 12. Although technically, Holmes merged with DDS, for ease of
reference we will refer to this merger as the merger between Holmes
and Dillard unless specifically referred to otherwise.

On April 19, 1989, at the direction of Dillard's personnel, Holmes notified its employees assigned to the corporate planning division and the warehouse facilities that they would be terminated as of May 9 if Holmes's stockholders approved the proposed merger with Dillard. Certain "transitional" employees at the warehouse facilities and the corporate offices received notification between April 21 and 28, informing them that they would be laid off sometime between May 9 and July 1. Finally, on May 12, employees in the Canal Street retail store were notified that they would be laid off between June 10 and July 8.

Because it was clear that the WARN Act sixty-day notice requirement would not be met with respect to certain employees, Dillard[2] made efforts to comply with WARN's damages provision. First, Dillard determined which employees were entitled to payments under the WARN Act, and as to those employees, the amount owed. Under Dillard's interpretation of the statute, part-time employees were not entitled to the notice, and, as such, they were not entitled to any damages in lieu of notice. Dillard further determined that the sixty-day penalty period in 29 U.S.C. § 2104(a)(1)(A) referred to the number of work days within that period rather than the number of actual calendar days. This interpretation meant that each full-time employee who had not

---

[2]In respect to events that occurred after the merger, a reference to Dillard should be interpreted as including Holmes, unless Holmes is specifically discussed separately.

received the full sixty-day notice would be entitled to payment for those days the employee would have worked had the full sixty-day notice been given. Relying on the provisions of § 2104(a)(2) of the Act, Dillard also concluded that it could deduct from this amount any severance pay or vacation pay that Dillard owed the employee.

After the two companies merged, and as a direct result of the merger, numerous employees were involuntarily terminated between May 8 and August 9, 1989. These former employees[3] sued a number of defendants, arguing that Dillard violated the WARN Act when it failed to provide the "affected employees" the required sixty-day notice of termination. In addition, the employees argued that Dillard failed to pay them the proper amount of damages in lieu of notice.

## II

Initially, the employees sued Dillard and Holmes. Later, however, the employees amended their complaint, adding as defendants individual officers and directors of both Holmes and Dillard, as well as the Federal Insurance Company ("Federal

_____

[3]The former employees constitute a class that we will refer to as "the former employees" or simply "the employees." That class is composed of "all former employees of either D.H. Holmes Co., Ltd. (Holmes) and or Dillard Department Stores, Inc. (Dillard) who were involuntarily terminated from employment between May 8, 1989, and August 9, 1989, as a result of the acquisition of Holmes by Dillard and who did not receive sixty (60) days written notice of said termination either personally or through their representative." Carpenters Dist. Council v. Dillard Dep't Stores, Inc., 778 F.Supp. 297, 300 (E.D. La. 1991).

Insurance"), Holmes's and Dillard's fiduciary liability insurer. As this lawsuit progressed, a number of motions were filed and ruled upon, and some of these rulings form the basis of this appeal and cross-appeal. First, in February 1991, the employees moved for partial summary judgment on the issue of liability under the WARN Act. In turn, Dillard moved for partial summary judgment, seeking to exclude from the plaintiff class certain groups of individuals that Dillard argued were not "affected employees"[4] under the statute. Dillard further sought to dismiss the employees' claim against the individual officers and directors of both Holmes and Dillard. Ultimately, the court granted the employees' motion for partial summary judgment, stating that Dillard violated the WARN Act. As to Dillard's motion, the district court granted partial summary judgment, dismissing the claims against the individual officers and directors. The court, however, did not exclude any of the contested members from the plaintiff class. In addition, because the officers and directors had been essentially dismissed from the suit, the court dismissed Federal Insurance from the suit because its only liability was tied to the possible liability of the officers and directors who had also been dismissed. See Carpenters Dist. Council v. Dillard Dep't Stores, Inc., 778 F.Supp. 297 (E.D. La. 1991).

---

[4]The WARN Act defines "affected employees" as "employees who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff by their employers." 29 U.S.C. § 2101(a)(5) (Supp. 1993).

In addition to its motion for summary judgment, Dillard had also filed a cross-claim against Federal Insurance and a third-party complaint against Liberty Mutual Insurance Company ("Liberty Mutual"). Dillard alleged that both insurance companies owed Dillard coverage, defense, and indemnity pursuant to a fiduciary liability insurance policy issued by Federal Insurance, and commercial general liability policies issued by Liberty Mutual. In response to Dillard's cross-claim, Federal Insurance moved for summary judgment, arguing that no coverage existed under its policies based on the allegations contained within the plaintiffs' complaint. Liberty Mutual also moved for summary judgment, asserting lack of coverage. The court granted summary judgment for both insurance companies. Id.

In September 1991, Dillard filed a second motion for summary judgment, this time alleging that the WARN Act is unconstitutional. The district court, in a separate opinion, denied Dillard's motion, holding that the WARN Act did not suffer any constitutional infirmities. See Carpenters Dist. Council v. Dillard Dep't Stores, Inc., 778 F.Supp. 318 (E.D. La. 1991).

In November 1991, the damages issue was tried to the district court, and the court awarded damages to employees. Following the trial, the employees sought prejudgment interest on the damage award, which the district court granted. In February 1992, the employees, in a separate civil action, further sought costs and attorneys' fees. Following an evidentiary hearing, the court

ordered Dillard to pay attorneys' fees and costs to the employees for both the original action as well as for the subsequent action seeking the attorneys' fees and costs. <u>See</u> <u>Carpenters Dist. Council v. Dillard Dep't Stores, Inc.</u>, 790 F.Supp. 663 (E.D. La. 1992).

### III

Dillard raises four issues on appeal. First, Dillard challenges the district court's determination that the WARN Act is constitutional.[5] Next, Dillard argues that the district court erred in holding that Dillard violated the WARN Act. However, even if Dillard did in fact violate the Act, Dillard contends that the district court improperly calculated the amount of damages Dillard owed its former employees. Finally, Dillard asserts that the district court erroneously granted summary judgment in favor of Federal Insurance and Liberty Mutual.[6]

---

[5]Dillard makes several arguments in support of its contention that the WARN Act is unconstitutional. Their arguments are meritless, and we affirm the district court's order denying Dillard's motion for summary judgment on that basis. <u>See</u> <u>Carpenters Dist. Council v. Dillard Dep't Stores, Inc.</u>, 778 F.Supp. 318 (E.D. La. 1991).

[6]Dillard argues that the district court erred in granting summary judgment in favor of Federal Insurance and Liberty Mutual because the plain language of the policies provide coverage, or alternatively, if the language of the policies was ambiguous, the policies should be construed in favor of coverage. Both policies, however, clearly do not provide coverage for liability imposed by the WARN Act. With respect to Federal Insurance, the policy in question provided coverage only for specifically defined "wrongful acts," of which violation of the WARN Act was not included. As to Liberty Mutual, their policy provided coverage for liability
(continued...)

-8-

In their cross-appeal, the former employees raise four issues for our consideration. First, the employees contend that the district court mistakenly determined that certain employees--the Bienville employees--were not "affected employees" as defined by the statute, and, as a result, those employees were erroneously denied benefits under the Act. Next, the employees argue that the district court erroneously concluded that the notices of termination that did not designate a specific date of termination constituted notice. Third, the employees contend that the district court improperly calculated the amount of attorneys' fees Dillard owed the employees. And, finally, the employees argue that the district court erred in applying regulations retroactively to a specific employee to deny her pay.

IV

We review a grant of summary judgment de novo. FDIC v. Myers, 955 F.2d 348, 349 (5th Cir. 1992). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We examine the record independently to determine

---

[6](...continued)
arising out of errors in the administration of an employee benefit program, or in connection with providing improper advice concerning such programs. Thus, we affirm the district court's grant of summary judgment on this issue.

if the movant is entitled to judgment as a matter of law, drawing any factual inferences in the light most favorable to the non-movant.  Degan v. Ford Motor Co., 869 F.2d 889, 892 (5th Cir. 1989).  Questions of law are subject to de novo review, United States v. Long, 996 F.2d 731, 732 (5th Cir. 1993), while findings of fact will be disturbed only if we find that they are clearly erroneous.  FED. R. CIV. P. 52(a).

### A.  Did Dillard Violate the WARN Act?

Although Dillard and Holmes acknowledge that certain affected employees did not receive the full sixty days notice of termination,[7] they argue that they were excused from the notice requirements because they fell within one of the two statutory exemptions.  Under the facts of this case, Dillard and Holmes can escape WARN Act liability only if either the "faltering company" exception or the "unforeseen business circumstances" exception applies.

To fall within the "faltering company" exemption, an employer must meet four requirements.  The Act states that

> an employer may order the shutdown of single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which,

---

[7]Dillard does not challenge the fact that it initially falls within the general scope of the WARN Act.  Dillard does not assert that it is not an "employer" within the meaning of WARN. 29 U.S.C. § 2101(a)(1) (Supp. 1993).  Likewise, Dillard concedes that the layoffs and closings of the facilities at issue here fall within the WARN Act definition of "plant closing" and "mass layoff."  29 U.S.C. §§ 2101(a)(2), (3) (Supp. 1993).

if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that the giving the notice required would have precluded the employer from obtaining the needed capital or business.

29 U.S.C. § 2102(b)(1) (Supp. 1993). This exception applies only when a layoff is caused by the employer's failure to obtain sufficient capital. See 54 Fed. Reg. 16061 (April 20, 1989) ("The need for notice will only be triggered if the employer fails to obtain the business or financing it seeks."). In this case, however, there is no causal connection between Holmes's[8] search for capital and the ultimate reduction in work force. Although it is true that at the time notice should have been provided Holmes was actively searching for a new line of credit, the actual cause of the mass layoff was not a failure to obtain an adequate line of credit; instead, the cause of the layoff was the merger between Holmes and Dillard. Because there was no causal relationship between Holmes's search for additional capital and the reduction in its work force, the "faltering company" exception does not apply to exempt it from liability for failing to give notice for the ultimate layoff, which was in fact caused by the merger.

Next, Dillard contends that its failure to provide the full sixty days notice was excused under the "unforeseen business circumstances" exemption. This exemption provides that "[a]n employer may order a plant closing or mass layoff before the

---

[8]Dillard, a financially healthy organization, has never argued that it was entitled to "faltering company" status.

conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A) (Supp. 1993). According to the proposed rules, an unforeseeable circumstance is "caused by some sudden and unexpected action or condition outside the employer's control."[9] 20 C.F.R. § 639.9(b)(2) (1988)(proposed regulations).[10] As with the "faltering company" exception, this exception to the general rule is to be narrowly construed. 20 C.F.R. § 639.9(a) (1989)(final regulations).

Dillard argues that there was some uncertainty as to when, or even if, the SEC would approve the registration statement, and as to whether Holmes's stockholders would approve the merger. Therefore, it asserts, the resulting merger was an "unforeseen business circumstance." We cannot agree. For several months prior to March 9--the date notice should have been given for the May 9

_____

[9]Examples provided by the regulations include "a principal client's sudden and unexpected termination of a major contract with the employer, a strike at a major supplier of the employer, and an unanticipated and dramatic major economic downturn." 20 C.F.R. § 639.9(b)(2) (1988)(proposed regulations).

[10]The WARN Act was enacted on August 4, 1988, and it took effect on February 4, 1989. The Department of Labor ("DOL") promulgated proposed regulations in December 1988, and later issued final regulations on April 20, 1989, which took effect on May 22. See 54 Fed. Reg. 16042-01 (1989). In many respects, the proposed regulations are identical to the final regulations. In those cases, we will cite to the final regulations. However, in those instances where the final regulations differ from the proposed regulations, we will cite to those regulations in effect at the time in question. See infra note 19.

layoff--Dillard and Holmes had been intensely negotiating an agreement that would allow the two companies to merge. On March 6, three days before notice should have been given, a tentative agreement was reached. Both companies then sought SEC approval, and both companies actively promoted the merger. It is difficult to see how two companies that were busy promoting their merger can now argue that the resulting merger was unforeseeable. The fact that there were some uncertainties in the merger process does not make the resulting merger unforeseeable. We conclude that the merger was in fact foreseeable. Consequently, we hold that neither the merger itself nor any of the individual steps taken to effect the merger constitute "unforeseen business circumstances."[11] Because Dillard and Holmes are unable to satisfy the requirements of either exception under the WARN Act, sixty days notice of termination was required.[12]

---

[11]Even if Dillard and Holmes had fallen within the scope of either the "faltering company" exemption or the "unforeseen business circumstances" exemption, both failed to provide proper notice under the DOL regulations. If an employer is providing less than sixty days notice pursuant to one of the statutory exemptions, the employer must "provide a brief statement of the reasons for reducing the notice period. . . ." 20 C.F.R. § 639.9 (1989)(final regulations). None of the notices provided to employees contained a brief statement of the reasons for providing less than sixty days notice.

[12]Dillard also argues that the district court erred in determining that Dillard and Holmes were jointly and severely liable because the "merger" between Holmes and Dillard was not a "sale" as contemplated by the Warn Act. Carpenters Dist. Council, 790 F.Supp. at 666-67; see also 29 U.S.C. § 2101(b)(1) (Supp. 1993). We disagree, and we affirm the district court's holding on

(continued...)

B.    Work Days vs. Calendar Days

The next issue concerns whether the district court erred by calculating damages on the basis of calendar days instead of work days.  Dillard contends that the district court improperly included in the damage award payment for non-work days i.e., Saturdays, Sundays, and holidays.  The district court held that "the time period for which penalty payments would be due are 60 individual work days and not the number of work weeks contained within a 60 day period."  Carpenters Dist. Council, 778 F.Supp. at 308.

The absolute starting point for interpreting a statute is the language of the statute itself.  United States v. Sosa, 997 F.2d 1130, 1132 (5th Cir. 1993); In re Hammers, 988 F.2d 32, 34 (5th Cir. 1993).  If the language is clear and unambiguous, then the court may end its inquiry.  United States v. Sosa, 997 F.2d at 1132.  If, however, a statute is susceptible to more than one reasonable interpretation, then the reviewing court must look beyond the language of the statute in an effort to ascertain the intent of the legislative body.  In re Hammers, 988 F.2d at 34.

---

[12](...continued)
this issue except to the extent that the district court held that the "merger" between Dillard and Holmes was not a "merger" under Louisiana law.  Carpenters Dist. Council, 790 F.Supp. at 666, n.7. As the district court correctly noted, this "merger" consisted of a transaction among three corporate entities--Holmes, Dillard, and DDS Acquisition Corporation, a wholly owned subsidiary of Dillard. After the respective stockholders of each corporation approved the merger plan, DDS and Holmes merged, with Holmes continuing in existence as the surviving wholly-owned subsidiary of Dillard.  In corporate tax parlance, this is known as a "reverse triangular merger."  See supra note 1.

Section 2104[13] spells out in some detail the amount of damages

an employer must pay if it does not provide its employees with

[13]Section 2104 provides in pertinent part:

(a)  Civil actions against employers

> (1)  Any employer who orders a plant closing or mass layoff in violation of [the WARN Act] shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for--
>
>> (A)  back pay for each day of violation at a rate of compensation not less than the higher of--
>>
>>> (i)  the average regular rate received by such employee during the last 3 years of the employee's employment; or
>>>
>>> (ii)  the final regular rate received by such employee;  * * *
>
> Such liability shall be calculated for the period of the violation, up to a maximum of 60 days, but in no event for more than one-half of the number of days the employee was employed by the employer.
>
> (2)  The amount for which an employer is liable under paragraph (1) shall be reduced by--
>
>> (A)  any wages paid by the employer to the employee for the period of violation;
>>
>> (B)  any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation; * * *
>
> (3)  Any employer who violates [the WARN Act] with respect to a unit of local government shall be subject to a civil penalty of not more than $500 for each day of such violation * * *
>
> (6)  In any such suit, the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs. * * *

29 U.S.C. § 2104 (Supp. 1993).

-15-

adequate notice of a mass layoff or a plant closing.  If an employer violates the notice provision, the employer must pay the aggrieved employee "back pay for each day of the violation [period]." 29 U.S.C. § 2104(a)(1)(A) (Supp. 1993).  On one hand, the term "back pay" connotes a remedy that would require the payment of a sum such that the employees would be put in the same position they would have been had the violation never occurred.  On the other hand, "each day of the violation" appears to require payment of "back pay" damages for each calendar day within the violation period, which would put the employees in a significantly better position than they would have enjoyed had the employer provided the full sixty-day notice.  See United Steelworkers of America v. North Star Steel Co., 5 F.3d 39 (3d Cir. 1993), petition for cert. filed, 62 U.S.L.W. 3429 (U.S. Dec. 13, 1993)(No. 93-936)(holding that the statute requires payment of damages based upon the number of calendar days within the violation period); Jones v. Kayser-Roth Hosiery, Inc., 748 F.Supp. 1292, 1296 (E.D. Tenn. 1990)(holding that the statute requires payment of damages based upon the number of work days within the violation period). Because the statute is susceptible to more than one reasonable interpretation, we will examine all available materials to determine the intent of Congress.  Our starting point, however, is the statute.

Interpreting WARN's damage provision as requiring payment for work days only is well supported by the language of the section.

First, the term "back pay" commonly means pay, i.e., wages, benefits, etc., that an employee would have earned, or to which she would have otherwise been entitled, if the event that affected such job related compensation had not occurred. Indeed, the Supreme Court has said that "back pay" requires "payment . . . of a sum equal to what [the employees] normally would have earned" had the violation never occurred. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 197, 61 S.Ct. 845, 854, 85 L.Ed. 1271 (1941). Further, the Supreme Court has explained that "back pay" suggests a remedy such that the damaged employee is restored "as nearly as possible, to that which would have [been] obtained but for the [violation]." Id. at 194. If aggrieved employees are paid only for days they ordinarily would have worked during the sixty-day notice period, then those employees are placed in the position they would have occupied had the violation never occurred.[14] But see United

---

[14]The Third Circuit, however, provides two arguments for interpreting the term "back pay" as requiring payment for each calendar day within the violation period, and in doing so, they have, in our view, essentially written the term out of the statute. See United Steelworkers of America v. North Star Steel Co., 5 F.3d at 41-43 (holding that "WARN uses the term `back pay' simply as a label to describe the daily rate of damages payable"). In Steelworkers, North Star Steel argued that the term "back pay" should connote a "lost earnings" concept. Under the "lost earnings" concept, an employee would receive payment for time he or she would have worked during the sixty-day notice period, but was not allowed to. The Third Circuit rejected this argument because of the effect the "lost earnings" concept would have on other sections of the statute. They reasoned that the lost earnings concept would render superfluous § 2104(a)(2)--the damage provision that allows an employer to reduce damages by wages paid for work performed during the violation period. See supra note 13.
(continued...)

According to the Third Circuit, adopting the "lost earnings" concept would render § 2104(a)(2) superfluous because "lost earnings" reflect a net earnings figure; in other words, the "lost earnings" calculation would by definition subtract wages an employer had already paid the employee for work performed during the violation period, and as such, there would be no need for § 2104(a)(2). This argument, however, is based upon a flawed reading of the statute that disregards the statutory distinctions between termination of an employee and reduction of an employee's work hours. As the Conference Report clearly states, the violation period is composed of those days after the employee has been terminated or after the employee's hours have been substantially reduced without adequate notice. H.R. Conf. Rep. No. 100-576, 100th Cong., 2nd Sess. 1052 (1988), reprinted in 1988 U.S.C.C.A.N. 2078, 2085. Section 2104(a)(2) allows an employer to deduct wages earned for work performed during the violation period. This section is effective only in those instances where the "employment loss" is a substantial reduction in hours, as opposed to complete termination. See 29 U.S.C. § 2101(a)(6)(C) (Supp. 1993). Where an employee's hours are reduced without proper notice, the employee will continue to work during the violation period. Where, as here, the employee is terminated, § 2104(a)(2) is inapplicable because by definition an employee who has been terminated cannot earn any wages during the violation period. The Third Circuit mistakenly concluded that employees who have been terminated can earn wages during the violation period. They further concluded that § 2104(a)(2) allows an employer to deduct wages earned before the violation period-- something that § 2104(a)(2) expressly disallows. Thus, the Third Circuit's argument against using the lost earnings concept for "back pay" fails to withstand scrutiny.

The Third Circuit further reasoned that there would be an additional "conflict between Subsections 2104(a)(1) and 2104(a)(2)(A)" if "back pay" were interpreted as meaning "lost earnings". United Steelworkers, 5 F.3d at 43. Under WARN, an employer is entitled to reduce its liability to aggrieved employees only by those payments within the categories set forth in § 2104(a)(2) that an employer paid to its employees. According to the Third Circuit, the concept of lost earnings, which is remedial, is inconsistent with the statutory scheme; a true lost earnings scheme would allow the employer to reduce its liability by any earnings that the employees received during the period of violation, even if those earnings were received from a subsequent employer. Id. The WARN Act, however, does not include a provision that would allow an employer to deduct wages earned by an employee from other sources. Consequently, the Third Circuit concluded,
(continued...)

Paperworkers Int'l Union v. Specialty Paperboard, Inc., 999 F.2d 51, 55 (2d Cir. 1993)(stating in dicta that a WARN Act claim is not a true claim for back pay because it does not compensate for past services, but nevertheless stating damages "are measured as two months pay and benefits").

Second, the legislative history makes it clear that Congress intended the "back pay" language in WARN to connote the traditional back pay remedy as discussed in Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 197, 61 S.Ct. 845, 854, 85 L.Ed. 1271 (1941)(damages "of a sum equal to what [the employees] normally would have earned" had the violation never occurred). The Senate Report states that

> [f]or violations of the notice provisions, damages are to be measured by the wages . . . the employee would have received had the plant remained open or the layoff had been deferred until the conclusion of the notice period, less any wages or fringe benefits received from the violating employer during that period. This is in effect a liquidated damages provisions [sic], designed to penalize the wrongdoing employer, deter future

---

[14](...continued)
"back pay" could not have been intended to connote a lost earnings concept. Id. We find this argument unpersuasive. Although we agree that the lost earnings concept creates a remedy that is generally remedial in nature, we are untroubled by the fact that the statutory scheme fails to provide a remedy that is something other than a pure "make whole" remedy. There are plausible reasons why Congress could choose not to include a provision that would make the WARN compensation provisions purely remedial, e.g., the desire to avoid placing a burden on a terminated employee to mitigate damages by taking any job offered, the desire to give a terminated employee a window of time to readjust without immediately having to search for a job, the desire for simplicity in the statutory scheme, etc. Without express language or legislative history directing us to a reason or other motivation behind this decision, we will not speculate as to the hidden significance, if any, behind the lack of such a provision.

> violations, and facilitate simplified damages proceedings.

S. Rep. No. 62, 100th Cong., 1st Sess. 24 (1987)(emphasis added). Damages calculated by measuring the wages the employee would have received had the employee continued working requires a calculation using the number of work days in the violation period rather than the number of calendar days. To use calendar days would provide an employee with damages in excess of what he or she would have received had the plant remained open, or had the layoff been deferred until the conclusion of the notice period.

Finally, unlike the "calendar-day" approach advocated in United Steelworkers of America v. North Star Steel Co., 5 F.3d 39, 43 (3d Cir. 1993), petition for cert. filed, 62 U.S.L.W. 3429 (U.S. Dec. 13, 1993)(No. 93-936), the "work-day" interpretation of WARN's damages provision does not lead to anomalous results. A well-accepted canon of statutory construction requires the reviewing court to avoid any interpretation that would lead to absurd or unreasonable outcomes. Birdwell v. Skeen, 983 F.2d 1332, 1337 (5th Cir. 1993). In United Steelworkers, defendant North Star Steel Co. provided the court with a hypothetical situation which, they argued, demonstrated the inequities inherent in the "calendar-day" approach. United Steelworkers of America v. North Star Steel Co., 5 F.3d at 43. The Third Circuit, however, dismissed North Star's

argument,[15] but we find North Star's hypothetical to be a good example of why the "calendar-day" approach cannot be the approach Congress intended.  In this hypothetical situation, an employer violates the WARN Act by terminating employees without providing any advance notice.  Thus, the violation period contains sixty days.  Employee "A" is a full-time employee who works a regular eight-hour shift each weekday.  However, employee "B" is a part-time employee who works just one ten-hour shift each Saturday.  Under the Third Circuit's calendar-day approach, employee "A" would receive 480 hours pay in lieu of notice (eight hours per day times sixty days), while part-time employee "B" would receive 600 hours pay (ten hours per day times sixty days).  As North Star Steel argued, it would be anomalous for the one-day-per-week part-time employee to receive 120 hours pay over and above that paid to the five-days-per-week full-time employee.  Under this calendar-day system, not only is the employer severely penalized for choosing to pay damages in lieu of notice, but the full-time employee is

---

[15]The Third Circuit dismissed North Star Steel's hypothetical situation because it was unwilling to discuss the method of calculating daily damages under §§ 2104(a)(1)(A)(i) and (ii).  United Steelworkers of America v. North Star Steel Co., 5 F.3d at 43.  We find it unnecessary to discuss the method of calculating daily damage rates under those provisions before discussing the hypothetical situation presented by North Star Steel; indeed, the precise method of calculation raises many questions.  It is clear, however, that those provisions require the calculation of damages based on the daily amount an employee earns, and regardless on how the amount of daily damages is reached, North Star Steel's hypothetical situation illustrates the anomalous results that emanate from the calendar day approach.

treated inequitably, and the part-time employee gets a windfall.[16]

Under the "work-day" approach, however, such bizarre results do not occur. Employee "A" is paid for the number of work days Employee "A" would have worked within the sixty-day period, which would work out approximately to eight hours per day times five days per week times eight weeks. Employee "B", on the other hand, would receive payment in lieu of notice that would reflect the employee's part-time status, i.e., approximately ten hours per week times eight weeks. This is a plain-sense result in a day and time when it is common to find employees with work schedules that vary from the traditional eight-hour day, forty-hour work week. It is for the foregoing reasons that we now hold that damages in lieu of the WARN Act notice are to be calculated using on the number of work days within the violation period.

---

[16]The number of examples demonstrating the inequitable effects of the "calendar-day" approach are seemingly never ending. For example, a similarly inequitable result is achieved if one full-time hourly-wage employee works eight hours per day, five days per week, while another full-time hourly-wage employee works ten hours per day but only four days per week. Under the calendar day approach, the first employee would be entitled to 480 hours worth of pay over a sixty-day violation period while the second employee would be entitled to 600 hours of pay, notwithstanding that each was paid the same wages, and worked the same number of hours per week.

C. Which Employees Are Entitled to Damages

Next, Dillard contends that the district court erred in determining which employees were "aggrieved employees"[17] because the court included certain employees who actually received sixty days notice of termination prior to their actual termination. To notify its employees of their termination dates, Dillard sent out three sets of notices. Because Dillard was unable to predict with absolute precision the number of employees needed during the transition period, the last two sets of notices provided the employees with a range of dates in which the termination would likely occur.[18] Although Dillard anticipated that the employees would be terminated within the estimated range of dates, in actuality, some of the employees continued working past the estimated termination dates such that they actually received the entire sixty days notice prior to termination. So, even though the original notice dates provided less than sixty-days notice, those employees who continued working had the benefit of full notice. The district court, however, determined that

_____

[17]The term "aggrieved employee" means "an employee who has worked for the employer ordering the plant closing or mass layoff and who, as a result of the failure by the employer to comply with [the WARN Act] did not receive timely notice either directly or through his or her representative as requires by [the Act]." 29 U.S.C. § 2104(a)(7) (Supp. 1993).

[18]Between April 21 and 28, 1989, Dillard informed certain affected employees that they would be laid off between May 9 and July 1. Notices were also issued on May 12 to a third group of employees informing the employees that they would be terminated between June 10 and July 8.

> in those instances where an employee was advised that he would be terminated between two set dates, and the earliest set date was less than 60 days from the date notice was received, the employer has failed to comply with the Act . . . even if . . . the employee was actually discharged more than 60 days from receiving notice.  Notice that sets the earliest date an employee could be discharged, at less than 60 days from receipt of notice, by its very terms, fails to meet the requirements of the Act.

Carpenters Dist. Council, 778 F.Supp. at 312.  The effect of the district court's ruling was that Dillard was required to pay damages to some employees who actually were afforded sixty days of notice as required by the WARN Act.

Dillard argues that the district court's interpretation is inconsistent with both the language and the purpose of the Act, and we agree.  The WARN Act only requires that employers provide sixty days notice of any plant closing or mass layoff.  29 U.S.C. § 2102(a) (Supp. 1993); 20 C.F.R. § 639.1(a) (1989)(final regulations).  As noted above, if an employee receives less than sixty days notice, then the employee is entitled to back pay for each day of the violation period.  The violation period is comprised only of those "days after the shutdown or layoff in violation of [the WARN Act] and extends for the number of days that notice was required but not given."  H.R. CONF. REP. NO. 100-576, 100th Cong., 2nd Sess. 1052 (1988), reprinted in 1988 U.S.C.C.A.N. 2078, 2085.  Thus, if an employee was provided with a range of possible termination dates, some before the sixty-day period ended and some beyond the sixtieth day, and the employee was terminated

-24-

beyond that sixty-day period, such that he actually worked throughout the entire notice period, then there is no violation period. Because there is no violation period, "back pay for each day of violation" would amount to zero damages. See 29 U.S.C. § 2104(a)(1)(A) (Supp. 1993). However, if that employee was actually terminated <u>within</u> the sixty-day notice period, such that the employee actually received less than the full sixty days notice, then the violation period would range from the actual date of termination until the end of the sixty-day notice period. In such a case, the employee would then be entitled to damages for "each day of violation." We hold, therefore, that those employees who actually received sixty days notice before their termination are not entitled to "back pay" damages.[19] Because we reverse the

_____

[19]The employees argue that the second and third sets of notices, which provided a range of estimated termination dates, should be treated as <u>no</u> notice, rather than defective notice. They argue that under the final regulations, the range of estimated termination dates must be fourteen days or less, and because the range provided by Dillard greatly exceeded fourteen days, the notice provided amounted to no notice. See 20 C.F.R. § 639.7(b) (1989)(final regulations). We disagree. First, as the district court correctly noted, neither the regulations nor the Act itself addresses how the courts are to treat notices that are determined to be defective or inadequate. <u>Carpenters Dist. Council</u>, 778 F.Supp. at 312, n.16. As such, neither the Act nor the regulations suggest that defective notice is automatically to be treated as though no notice had been provided at all. Moreover, we are not persuaded that the regulations require such. Although the final regulations, which became effective on May 22, 1989, require that a range of estimated termination dates cannot exceed fourteen days, the interim regulations did not address the matter. See 20 C.F.R. § 639.7 (1988)(proposed regulations). Thus, at the time Dillard provided notice to its employees, the proposed regulations were in effect, although the layoffs occurred after May 22, after the final
(continued...)

district court's holding with respect to the number of compensable days within the violation period and the number of employees who are entitled to damages, we must remand this case for a determination of damages consistent with this opinion.

## D. Good Faith Reduction of Damages

Dillard argues that the district court abused its discretion by not reducing its liability because Dillard acted in good faith and reasonably believed that it had complied with the Act. Any assessment of an employer's good faith or grounds for its belief in the legal propriety of his conduct is necessarily a finding of fact, to be disturbed on appeal only if clearly erroneous. Laffey v. Northwest Airlines, Inc., 567 F.2d 429, 464 (D.C. Cir. 1976),

---

[19](...continued)
regulations became effective. The employees argue, however, that the date of the layoffs, rather than the date of the notices, ought to determine which regulations applied to Dillard's notices. They rely upon a district court case, Finnan v. L.F. Rothschild & Co., 726 F.Supp. 460, 463 (S.D.N.Y. 1989), in which the court was faced with a question far different from the question posed here. In Finnan, the employer terminated employees within the sixty-day period after the WARN Act was first enacted. Thus, the court was faced with the question of whether a layoff or plant closing that occurs within the first sixty days of the enactment of WARN was subject to the Act. In determining whether the Act applied at all, the court noted that the "language of the statute focuses on the closing or layoff as the affected event." Id. at 463. In the case at bar, we are faced with the question of when the proposed regulations versus the final regulations apply. The Department of Labor's regulations are designed to help employers determine when notice is required, what that notice should contain, and what constitutes a violation of the Act. Because the WARN Act focuses upon employer notification of employees concerning impending mass layoffs and plant closings, we find that the regulations in effect at the time the notices were provided controls.

cert. denied, 434 U.S. 1086, 98 S.Ct. 1281. 55 L.Ed.2d 792 (1978).

The WARN Act states that

[i]f an employer which has violated this chapter proves
to the satisfaction of the court that the act or omission
that violated [the WARN Act] was in good faith and that
the employer had reasonable grounds for believing that
the act or omission was not a violation of this chapter
the court may, in its discretion, reduce the amount of
the liability or penalty provided for [in the Act].

29 U.S.C. § 2104(a)(4) (Supp. 1993).

In this case, after the damages issues were tried to the court, the district court held that no good faith reduction of damages was warranted. First, the court found that Dillard did not subjectively believe that it complied with the notice requirements of the Act. The court noted that there was evidence that at the time the WARN Act requirements were discussed with Dillard's legal advisors, Dillard knew that it was well within the sixty-day notice period based on the projected date of the layoffs, and Dillard conceded that it was not relying on the two exceptions to establish its qualification for a reduction in damages based on its good faith. Moreover, throughout the process of calculating the WARN Act damages, when faced with any arguable point of law, Dillard consistently resolved any questionable issue in its favor. Dillard concluded, for example, that it could deduct from damages any vacation pay it already owed its employees, a conclusion that Dillard's own legal advisors characterized as "aggressive" or "on tenuous grounds." The district court concluded that at some point, Dillard's conclusions concerning the calculation of damages become

objectively unreasonable, and as such, Dillard was not entitled to a "good faith" reduction in damages. Although we are mindful that Dillard was caught in a difficult position with respect to the notification requirements, and although we recognize that Dillard made significant WARN payments to a significant number of employees, we cannot say that the district court's refusal to reduce damages is clearly erroneous.

### E. Prejudgment Interest

Dillard argues that the district court's award of prejudgment interest was improper. See Carpenters Dist. Council, 790 F.Supp. at 673-75. We disagree. As the district court noted, federal law governs the range of remedies, including the allowance and rate of prejudgment interest, where a cause of action, as in this case, arises out of federal statute. F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., 417 U.S. 116, 127, 94 S.Ct. 2157, 2164, 40 L.Ed.2d 703 (1974); Hansen v. Continental Ins. Co., 940 F.2d 971, 983 (5th Cir. 1991). Federal law provides, inter alia, that interest "shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a) (Supp. 1993); see also Guidry v. Booker Drilling Co., 901 F.2d 485, 488 (5th Cir. 1990)(holding that when a federal court's jurisdiction is predicated upon a federal question, § 1961 does not preclude the award of prejudgment interest). The determination of whether prejudgment interest should be awarded requires a two-step analysis: does the federal act creating the cause of action

preclude an award of prejudgment interest, and if not, does an award of prejudgment interest further the congressional policies of the federal act. <u>Hansen v. Continental Ins. Co.</u>, 940 F.2d at 984 n.11; <u>Guidry v. Booker Drilling Co.</u>, 901 F.2d at 488. If prejudgment interest can be awarded under the two-prong test, whether such interest is awarded in any given case is within the court's discretion. <u>Calderon v. Presidio Valley Farmers Ass'n</u>, 863 F.2d 384, 392 (5th Cir. 1989) <u>cert. denied</u>, 493 U.S. 821, 110 S.Ct. 79, 107 L.Ed.2d 45 (1989); <u>Oil, Chemical & Atomic Workers Int'l Union v. American Cyanamid Co.</u>, 546 F.2d 1144, 1144 (5th Cir. 1977).

In this case, the district court's award of prejudgment interest was not an abuse of discretion. First, the WARN Act does not preclude an award of prejudgment interest. Although § 2104(b) states that "[t]he remedies provided for in this section shall be the exclusive remedies for any violation of this chapter[,]" the Act also states that "[t]he rights and remedies provided to employees by this chapter are in addition to and not in lieu of, any other contractual or statutory rights and remedies of the employees, and are not intended to alter or affect such rights and remedies. . . ." 29 U.S.C. §§ 2104(b), 2105 (Supp. 1993). Thus, the "back pay" remedy provided under § 2104, while the only remedy provided to employees under the WARN Act, does not preclude the award of prejudgment interest under 28 U.S.C. § 1961. Moreover, given our holding that back pay damages essentially are wages to

-29-

which employees would have received had proper notice been provided, an award of prejudgment interest furthers the congressional purpose behind the WARN Act--providing compensation to employees in lieu of proper notice such that the employees would be put in the same position as if the full sixty days notice had been provided. As the district court accurately detailed, prejudgment interest will fully compensate employees for the lost use of wages that should have been paid if an employer fails to provide adequate notice. Prejudgment interest will also provide an incentive for employers to settle meritorious claims of aggrieved employees quickly, fairly, and without unnecessary delay. See Carpenters Dist. Council, 790 F.Supp. at 674. Therefore, we hold that a trial court may, in its discretion, award prejudgment interest to aggrieved employees for the WARN Act violations. We further hold that the district court in this case did not abuse its discretion in awarding prejudgment interest.[20]

---

[20]Dillard's chief argument against the award of prejudgment interest centers upon the district court's award of back-pay damages based upon the number of calendar days within the violation period. Dillard argues that the penalty effect of the calendar-day approach makes the WARN Act an inappropriate vehicle for prejudgment interest, since the purpose of such interest is to compensate the victim, rather than punish the wrongdoer. See, e.g., Illinois Cent. R.R. Co. v. Texas E. Transmission Corp., 551 F.2d 943, 944 (5th Cir. 1977). In the light of the fact that we have reversed the district court's ruling concerning the use of calendar days rather than working days to calculate the amount of back pay owed each employee, thus, removing the penalty effect of the back-pay damage award, Dillard's point is essentially moot.

F.  The "Bienville" Employees

In its cross-appeal, the employees contend that the district court erred in determining that certain employees who were terminated on May 9 were not entitled to WARN notice.  These employees made up part of Holmes's corporate division, although they were not based in the "regular" corporate office in the Canal Street site.[21]  Instead, because of space considerations, they were located some distance away from the Canal Street location in offices known as the "Bienville site."  The district court held that the Canal Street corporate division and the Bienville site did not comprise a "single site of employment" under the WARN Act.  Further, the district court held that "there were insufficient numbers of employees assigned to [the Bienville site] to [bring the Bienville site itself] within the Act."  Carpenters Dist. Council, 790 F.Supp. at 667.  As such, the district court held that those Bienville site employees were not entitled to notice of termination.  The employees have appealed this decision, contending that the two offices constituted a "single site of employment" under the WARN Act.

As a preliminary matter, we must determine the standard of review to be applied.  Neither Dillard nor the employees endorse a particular standard of review, and we have been unable to locate

[21]At the same location on Canal Street were two "sites" of employment for the purposes of the WARN Act:  the Canal retail store and Holmes's corporate division.  We are concerned here only with Holmes's corporate division.

any existing case law on this particular WARN Act question.  Upon reflection, we conclude that the question of whether multiple work locations constitute a "single site of employment" under the WARN Act is a mixed question of fact and law.  Federal Rule of Civil Procedure 52(a) prescribes the clearly erroneous standard for findings of underlying fact.  Whether multiple locations constitute a "single site" under the WARN Act, however, is a legal conclusion to be drawn from the underlying historical facts.  The underlying facts relevant to a determination of the "single site" issue in this case are largely undisputed, and as such, we have no occasion to apply the clearly erroneous standard.  As a conclusion of law, however, the issue of whether the two employment locations constitute a "single site of employment" is reviewed de novo by this court.  Cf. Radio WHKW, Inc. v. Yarber, 838 F.2d 1439, 1442 (5th Cir. 1988).  We now turn to the merits of the employees' argument.

Under the WARN Act, notice of mass layoffs or plant closings is required if there is a sufficiently large "plant closing" or "mass layoff" at a single site of employment.  See 29 U.S.C. §§ 2101(a)(2) and (3) (Supp. 1993).  If the threshold requirements are met, the employer is required to provide notice of termination to all affected employees at that "single site of employment." Although the statute itself does not define the term "single site of employment," the regulations promulgated by the Department of Labor provides some guidance.  The proposed regulations stated that

(1) A single site of employment can refer to either a single location or a group of contiguous locations. Groups of structures which form a campus or industrial park, or separate facilities across the street from one another, may be considered a single site of employment.

(2) Separate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment. An example is an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees form one building to another.

(3) Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site. For example, assembly plants which are located on opposite sides of town and which are managed by a single employer may be considered separate sites if they employ different workers.

(4) The term "single site of employment" may also apply to unusual organizational situations where the above criteria do not reasonably apply.

20 C.F.R. § 639.3(i) (1988)(proposed regulation). Dillard argued, and the district court held, that Holmes's corporate division at the Canal Street location and the employees at the Bienville site were two separate and distinct sites of employment under WARN. Specifically, the court noted that the two sites were several miles apart, that the personnel assigned to the Bienville site--those employees who performed construction facilities management, energy management and store planning--performed functions different from the functions provided by the workers in the Canal Street corporate division. The court noted that although the Bienville site employees' payroll checks were issued from the Canal Street

location, "this was an insufficient connection by itself to view the Bienville location and the Canal Street store as one site." Carpenters Dist. Council, 790 F. Supp. at 667.

On appeal, the employees contend that the Bienville site and the Canal Street corporate division were a "single site of employment" because the job functions of the Bienville employees were closely integrated with the job functions of the Canal Street corporate division. A complete review of the underlying facts leads us to agree with the employees' contention. The evidence before the district court demonstrated that up until 1980 or 1981, the Bienville site employees were housed along with all other corporate employees at the Canal Street corporate division office. As the corporate division grew, it could no longer be comfortably housed in the Canal Street corporate division offices. In an effort to relieve overcrowding in those offices, certain divisions--including construction facilities management, energy management, and store planning--were relocated to the Bienville site. Once moved to the Bienville site, those employees continued to perform precisely the same company-wide functions they provided when housed in the Canal Street location. The Bienville site employees remained integrated with the Canal Street corporate division after the move. The Bienville site had no support staff, and the Bienville employees continued to rely upon the support staff at the corporate division office. In spite of the move to the Bienville site, the employees nevertheless considered

themselves part of the corporate division, and Holmes continued to consider them corporate employees for payroll purposes. It is not irrelevant that the employees--precisely, like the Canal Street employees--were made redundant and lost their jobs directly because of the merger.[22] These factors lead us to conclude that the Bienville site and the Canal Street corporate division were merely one site of employment that was separated because of space considerations. In our view, this situation may be classified as "an unusual organizational situation" under the DOL regulations. See 20 C.F.R. § 639.3(i)(4) (1988)(proposed regulations). These employees were entitled to the WARN Act notice of termination, and, consequently, Dillard is liable for any damages associated with providing inadequate notice.[23]

### G. Retroactive Application of Regulations

Finally, the employees in their cross-appeal argue that the district court erroneously applied final regulations retroactively to deny a former Holmes employee back pay damages in lieu of notice. The former Holmes employee, Mary S. Krajcer, was a retail

---

[22]It appears that Dillard also considered the Bienville site employees part of the Canal Street corporate division. Employees at both sites were terminated on May 9, the layoff letters sent to both sites specifically stated that the layoff was occurring as a result of the discontinuance of the corporate functions at the Canal Street store.

[23]It is unclear from the record whether the Bienville site employees received no notice of termination, or whether they received less than sixty days notice. On remand, the district court will be required to determine what notice, if any, each affected employee received, and to calculate damages accordingly.

buyer for Holmes. As a buyer, she worked a regular forty-hour week, and as a rule, she worked weekends only a few times a year while on buying trips. She had no administrative duties, and she earned $36,000 per year plus bonuses. On April 18, 1989, Dillard offered Krajcer a position as a merchandising manager in one of its retail outlets. That position would have placed her second in command at that location, requiring her to hire and fire personnel, open and close the store each day, and work some nights, every Saturday, and some Sundays. Although the base salary was comparable to her position with Holmes, Krajcer would not be eligible for bonuses, and she would be required to work longer hours. When Krajcer refused Dillard's offer, Dillard terminated Krajcer on May 9 without providing any advance notice of termination.

Before the district court, the employees argued that Krajcer should have been paid back pay damages in lieu of notice. The district court, however, held that Krajcer was not entitled to such damages because she refused Dillard's offer of employment as a merchandising manager. Essentially, the district court held that the position offered by Dillard did not amount to a "constructive discharge," and as such, her refusal to accept the new position amounted to a voluntary termination of employment, which does not require WARN notice. Carpenters Dist. Council, 790 F.Supp. at 669-70; see also 20 C.F.R. § 639.5(b)(2) (1989)(final regulations). In arriving at this determination, the district court applied the

final regulations, which became effective on May 22, 1989, see 54 Fed. Reg. 16042-01 (1989), rather than the proposed regulations that were in effect at the time Krajcer was terminated. The proposed regulations required that the new job must be "substantially equivalent in terms of pay and working conditions." 20 C.F.R. § 639.5(b)(2) (1988)(proposed regulations). On the other hand, the final regulations merely required that "the offer of reassignment to a different site of employment not be deemed a `transfer' if the new job constitutes a `constructive discharge.'" 20 C.F.R. § 639.5(b)(2) (1989)(final regulations). Because administrative rules should not be construed as having retroactive effect unless their language requires that result, see, e.g., Sierra Medical Ctr. v. Sullivan, 902 F.2d 388, 392 (5th Cir. 1990), we hold that the district court erred in applying the final regulations. Therefore, without expressing any view as to the merits, we remand this matter to the district court to determine whether, under the interim rules, Krajcer is entitled to back-pay damages.

V

For the foregoing reasons, we AFFIRM the district court's ruling on the constitutionality of the WARN Act, the summary judgment in favor of Federal Insurance and Liberty Mutual, the finding that Dillard violated the WARN Act, the refusal to reduce damages for good faith, and the award of prejudgment interest. We REVERSE the district court's ruling that damages are to be

calculated using calendar days, the decision that the Bienville site and the Canal Street corporate division were not a "single site of employment," the finding that employees who were actually provided sixty days notice are entitled to damages because notice of termination contained a range of dates, and the retroactive application of regulation to employee Mary Krajcer. As a result, we REMAND this case to the district court with instructions to calculate damages in a manner consistent with this opinion. Because this opinion affects the amount of damages Dillard will be required to pay the employees, the district court should also reconsider the award of attorney's fees accordingly.

AFFIRMED in Part, REVERSED in Part, and REMANDED.