James A. WASHINGTON, Hattie P. Rivers, James L. Scott, Beulah M. Parson, Daniel King, Lee Manning, Sarah Bracey, and Shirley Keels, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

AIRCAP INDUSTRIES, INC., Defendant.

Civ. A. No. 2:91–3153–18.

United States District Court,
D. South Carolina,
Charleston Division.

Aug. 16, 1994.

Kenneth Childs, David Dubberly, David Duff, Allen Smith, Columbia, SC, for plaintiffs.

Henry S. Knight, Jr., Linda Runge, Columbia, SC, for defendant.

## ORDER

NORTON, District Judge.

### I. *INTRODUCTION*

In this class action under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 through 2109 (1988) (WARN Act), Plaintiffs, former employees of Defendant, Aircap Industries, Inc. (Aircap), seek to recover damages for Aircap's failure to provide advance notice of its mass layoff and plant closing of June 17, 1991. On August 30, 1993, the court granted Plaintiffs' motion for partial summary judgment as to liability and denied Aircap's motion for summary judgment.

On April 11, 1994, this matter came before the court to establish Plaintiffs' damages. The following issues remain for resolution by the court:

1. Whether Plaintiffs are entitled to recover back pay under 29 U.S.C. § 2104(a)(1) for 60 calendar days or the 44 work days contained within the 60–day violation period;

2. Whether 29 U.S.C. § 2104(a)(2)(A)–(B) entitles Aircap to reduce its liability by the amount of wages paid to sixteen employees and by the amount of severance pay received by five members of the class; and

3. Whether Aircap carried its burden of proving that its representatives acted in good faith and had reasonable grounds for believing their actions were not a violation of the WARN Act, as required by 29 U.S.C. § 2104(a)(4) for a discretionary reduction in damages, and, if so, the amount of any such reduction.

## II. *FINDINGS OF FACT*

### A. *The Parties*

1. Until June 17, 1991, Plaintiffs worked for Aircap at its Manning facility as full-time "permanent" employees in the manufacturing process. The named Plaintiffs worked at the Manning plant from 18 to 26 years.

2. Aircap, a wholly-owned subsidiary of MTD Products, Inc. (MTD), is an Ohio Corporation which manufactures outdoor power equipment, such as lawn mowers. Aircap obtained the Manning location in 1981, and MTD acquired Aircap in 1986. At the time of the employee terminations involved in this action, Aircap had two manufacturing facilities—one in Manning, South Carolina, and the other in Tupelo, Mississippi. The Manning plant manufactured primarily electric and gasoline push and riding lawn mowers, while the Tupelo facility produced primarily gasoline mowers. Aircap closed the Manning plant and now operates only the Tupelo facility, which took on the manufacture of electric mowers as well. In addition to Aircap, MTD owns several other companies, located in Mississippi, Tennessee, and Ohio, which also manufacture outdoor power equipment.

### B. *Temporary Layoffs Prior to 1991*

3. During their tenure with Aircap, many of the Plaintiffs were temporarily laid off for varying durations at different times of the year, but with the understanding that they would be recalled. For example, Beulah Parson was laid off in 1983 from July 15 until August 15, and in 1984 from July 27 through August 15. In 1989, Ms. Parson was laid off from October 19 until December 4. Similarly, James Scott was laid off in 1986 from October 1 through November 24, and in 1989 from September 1 until November 6. Mr. Washington was laid off from September 19 through December 1986, and from June 25 until November 23, 1987. The timing, duration, and frequency of these layoffs, and even their occurrence, were unpredictable from year to year.

4. These temporary layoff periods usually included the paid vacation of the employees, which ranged from one to four weeks depending on the number of years worked at the plant. For example, when Ms. Parson was laid off in 1984 from July 27 through August 15, most of that time actually would have been paid vacation, rather than a true layoff, because of Ms. Parson's long tenure at the plant.

5. The timing of these periodic temporary layoffs varied by as much as six months in terms of when they occurred and did not affect the same employees every year. In addition, the duration of the temporary layoffs, which lasted from three weeks to four months, varied from person to person and from year to year. Therefore, due to the nature, timing, and duration of these periodic layoffs, coupled with the Plaintiffs' normal accrued vacation, no employee could predict when or if he or she would be laid off in a particular year or for a particular duration beyond vacation.

6. During the temporary layoffs, Aircap continued to pay the group health insurance premiums for the employees until they returned to work.

7. An examination of the numbers of employees working at Aircap each summer demonstrates that Aircap maintained a fairly large workforce year round. For example, throughout the summer of 1988, Aircap employed between 240 and 287 persons. In 1989, with the exception of two weeks in July, Aircap had over 200 employees working each week of the summer. In 1990, more than 250 people worked at the Manning plant through July 7, and the number of employees decreased below 150 only after August 5. At

the lowest employment level in 1990, Aircap continued to have 115 employees at its plant.

8. In contrast, the mass layoff of 1991 affected virtually every Aircap employee. Aircap began the month of June with 310 employees and concluded with 53. By February 13, 1992, only 25 employees were left at the Manning plant, and the plant has now closed.

9. When the prior temporary layoffs occurred, department supervisors orally advised the employees who were affected. Management also told the employees that they would be recalled, giving them a projected recall date, and in fact recalled each Plaintiff from any such layoff. Based on the evidence, the court finds that it was Aircap's custom and practice to routinely recall laid off employees, and, based on this custom and practice, Plaintiffs harbored a reasonable expectation of recall from all prior layoffs.

10. Aircap's witnesses conceded that Plaintiffs were never advised that they were temporary employees or that they would be employed only for the duration of a particular project or undertaking. In fact, Plaintiffs were classified as "permanent" employees under Aircap's personnel policies, and Aircap's personnel records show hire dates for the named Plaintiffs ranging from 1965 to 1973.

## C. *June 1991 Mass Layoff And Plant Closing*

11. On May 3, 1991, the Board of Directors of Aircap's corporate parent, MTD, held a meeting to discuss the future of the Manning facility. The minutes of the May 3, 1991 meeting state the following:

The Chairman next led a discussion regarding the necessity for increased profitability through a reduction of the plant and facilities base. After a thorough examination of various alternatives, it was determined that the best course of action would be to terminate or drastically curtail the outdoor power equipment production at the Manning facility and to further reduce the manufacturing operations in Canada, whereupon it was moved, seconded and unanimously carried that the philosophy of these reductions be approved and that the Chairman and President be authorized to adopt such measures as, in their discretion, would accomplish the desired reductions and realignment of facilities.

The court concludes that as of May 3, 1991, Aircap and MTD had in effect decided to close the Manning plant.[1]

12. Three days after the Board meeting, on May 6, 1991, Aircap distributed a memorandum to all employees notifying them of the summer holiday schedule. The memorandum made no mention of any possible mass layoff or plant closing, but, instead, indicated that the plant would be operating through the summer.

13. On or about June 6, 1991, Aircap laid off approximately 25 to 30 employees. This layoff, like all earlier temporary layoffs, was orally announced by a plant supervisor at the Manning facility. On June 10, 1991, the management of MTD summoned Rhomie Futch, Plant Manager, and Dick Bridges, Personnel Director, to a meeting at corporate headquarters in Cleveland, Ohio. At the meeting, MTD management advised them that no more lawn mowers would be produced at the Manning facility. The reasons for the reduction-in-force, as explained to Futch and Bridges, were economics and geography, as there had been a reduction in production at the Manning facility, the Manning plant was not located near any of MTD's other companies, and the location of the Manning plant resulted in greater freight costs to transport goods to and from the facility.

14. Also on June 10, 1991, MTD and Aircap management had an informal lunch meeting with their legal counsel, who is a

---

1. The date of this decision was in dispute at the hearing on April 11. Ted Moll, Group Vice President of MTD Products, characterized the decision as a "philosophy," saying that the Board merely directed the President to come back with specific recommendations and that the actual decision was made in an informal lunch meeting. This court gives more credibility to the minutes of the formal meeting of May 3, 1991, since important corporate decisions are usually discussed at a called board meeting where corporate minutes can be recorded, not during an informal lunch discussion.

member of the MTD Board, and his law partner, concerning the ramifications of the plant closing. Although the decision to close the plant had essentially been made on May 3, 1991, there is no evidence that management discussed this decision with their legal counsel until seven days before implementing the decision. Even then, management only consulted a lawyer-board member who had already voted to close the Manning plant and his law partner. Aircap did not procure a written legal opinion concerning the legality of terminating more than 250 employees without advance warning. The only evidence concerning this meeting with Aircap's attorneys is that based on the information informally provided by company officials to the attorneys, the attorneys were in agreement with corporate officials that the plant closing would not violate the WARN Act because it coincided with Aircap's so-called "seasonal" layoff period. This "opinion" can be characterized as superficial at best.

15. Following the meeting in Cleveland, Messrs. Futch and Bridges returned to Manning to implement the reduction-in-force. In addition to preparing written letters to the employees for distribution at the time of the announcement, Futch and Bridges scheduled a meeting with plant management for the morning of June 17, 1991. The purpose of this meeting was to advise the managers of the impending mass layoff.

16. On June 17, 1991, Futch and Bridges called the employees outside the building one department at a time. While standing outside, each employee was given a letter stating that he or she was being laid off, effective immediately, and that the layoff would exceed six months. Employees in the final assembly department, unlike their counterparts in other departments, were instructed to attend a meeting in the cafeteria. There they were given the same information about the layoff. No prior notice of the layoffs had been provided to the employees. Also on June 17, 1991, Aircap filed its WARN Notice of Closing with the South Carolina Employment Security Commission. The notice stated that Aircap would lay off 257 employees that day because of a "drastic downturn" in customer orders.

## III. CONCLUSIONS OF LAW

### A. Plaintiffs are entitled to back pay for each work day during the 60–day violation period

Section 2104 of the WARN Act sets forth the method for calculating each employees' damages. It provides:

(1) Any employer who orders a plant closing or mass layoff in violation of [the WARN Act] shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for—

(A) back pay for each day of violation at a rate of compensation not less than the higher of—

(i) the average regular rate received by such employee during the last 3 years of the employee's employment; or

(ii) the final regular rate received by such employee; * * *

Such liability shall be calculated for the period of the violation, up to a maximum of 60 days, but in no event for more than one-half of the number of days the employee was employed by the employer.

(Emphasis added.) The only reasonable interpretation of this provision requires that damages be calculated based on working days during a 60–calendar–day violation. See Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dep't Stores, 15 F.3d 1275, 1282–86 (5th Cir.1994).[2]

2. The only other federal court of appeals to decide this issue is the Third Circuit. See United Steelworkers of Am. v. North Star Steel Co., 5 F.3d 39 (3rd Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 1060, 127 L.Ed.2d 380 (1994). For all the reasons cited by the Fifth Circuit in Dillard Department Stores, this court rejects the Court of Appeals' holding and rationale in that case. See Dillard Dep't Stores, 15 F.3d at 1283, fn. 14. Essentially, the Third Circuit rejected a "lost earnings" approach because it believed that it would render section 2104(a)(2) of the Act which provides for a set-off for wages performed during the violation period superfluous. This argument is based upon a flawed reading of the statute and misunderstands the distinction between the termination of an employee and reduction of an employee's work hours. In particular, section 2104(a)(2) is inapplicable whenever an employee is terminated because he cannot earn any wages

The Fifth Circuit in *Dillard Dep't Stores* explained that the starting point for interpreting any statute is the language of the statute itself. *Id.* at 1282. If the language is clear and unambiguous, then the court may end its inquiry. *Id.* at 1283. If, however, the statute is susceptible of more than one reasonable interpretation, then the reviewing court must look beyond the language of the statute in an effort to ascertain the intent of the legislative body. *Id.* at 1283.

The WARN Act provides that the aggrieved employee is entitled to "back pay for each day of the violation [period]". 29 U.S.C. § 2104(a)(1)(A) (Supp.1993). On its face, this provision is ambiguous. As the Fifth Circuit explained, the term "back pay" connotes a remedy that would require the payment of a sum that would put the employee in the same position he would have been in had the violation never occurred. On the other hand, the term "each day of violation" appears to require payment of damages for each calendar day within the violation period, which would put the employee in a significantly better position than he would have been in had the violation not occurred. *Id.* at 1283.

Thus, the statute is susceptible to different interpretations and it is necessary to examine the statute in light of the intent of Congress. In so doing, the starting point is the language of the statute itself.

The language of the statute supports the interpretation of the damages provision as requiring payment for work days only. In particular, the term "back pay" commonly means the wages or benefits that the employee would have earned if the violation had not occurred. *Id.* at 1283 (citing *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941)). The Supreme Court in *Phelps* explained that "back pay" suggests a

remedy that restores the employee "as nearly as possible, to that which would have [been] obtained but for the [violation]". *Phelps* at 194, 61 S.Ct. at 852. If employees are only paid for days that they would have worked, this result will be achieved.

Also, an examination of the legislative history makes it clear that Congress intended the term "back pay" to connote the traditional remedy discussed in *Phelps*. *Dillard Dep't Stores* at 1284. For example, the Senate Report states that:

[f]or violations of the notice provisions, *damages are to be measured by the wages . . . the employee would have received had the plant remained open or the layoff had been deferred until the conclusion of the notice period . . .*

*Id.* (citing S.Rep. No. 62, 100th Cong., 1st Sess. 24 (1987)). Obviously, if wages were calculated using calendar days as opposed to working days, an employee would receive damages in excess of what he or she would have received as wages had he or she been given notice of the layoff. This "bonus" would contravene congressional intent.

Finally, as the Fifth Circuit pointed out, the "work day" approach also makes more sense because it does not lead to anomalous results. In *North Star Steel*, 5 F.3d 39 (3d Cir.1993), the defendant had presented a number of hypothetical situations which demonstrated the inequities in a "calendar day" approach.[3] The Fifth Circuit noted that the number of similar examples that could be cited was "seemingly never ending" given the number of employees whose schedule vary from the traditional work day or work week. *Id.* at 1285 fn. 16. If wages are calculated based on a work-day approach, then such inequities would not occur.

The only reasonable interpretation of the damages provision is that damages should be

during the violation period. The Third Circuit also concluded that a "lost earnings" approach was inconsistent with the statutory scheme because it is remedial and would allow an employee to offset earnings from a subsequent employer during the violation period. This argument makes no sense since the statute includes no such provision.

3. For example, employee "A" is a full-time employee who works a regular eight-hour shift each weekday and employee "B" is a part-time employee who works just one ten-hour shift each Saturday. Under the Third Circuit's calendar-day approach, employee "A" would receive 480 hours pay (eight hours per day times sixty days), while part-time employee "B" would receive 600 hours pay (ten hours per day times sixty days).

calculated using the number of work days within the violation period. This interpretation is also the most equitable since it would put the employee back in the same position he or she would have been in had he or she been given notice of the closing.

During their employment at Aircap, the employees all worked eight-hour shifts, five days a week. Excluding weekends, there would be 44 working days within the 60–day violation period. Therefore, the wages to which the employees would be entitled are their hourly wage rates multiplied by eight hours multiplied by 44 days.

**B.** ***Plaintiffs are entitled to a damages award of $607,066.79 plus prejudgment interest, costs, and a reasonable attorney's fee***

The parties have stipulated to the hourly wage rate of each class member. Based on those hourly rates, the amount of damages due to each class member for back pay during the 60–day violation period is calculated by multiplying the hourly rate by eight hours by the number of days that would have been worked during the violation period.

In addition to back pay, Plaintiffs are entitled to recover the cost of insurance premiums Aircap would have paid for 60 days. *Jones v. Kayser–Roth Hosiery, Inc.,* 748 F.Supp. 1292 (E.D.Tenn.1990). The parties also are in agreement concerning the amount of those contributions.

Under 29 U.S.C. § 2104(a)(2), an employer may reduce its liability by any voluntary and unconditional payment to an employee.[4] Aircap voluntarily paid severance pay to five Plaintiffs as follows:

| | | |
|---|---|---|
| a. | Reborah Mathis— | $ 522.40 |
| b. | Barbara Mitchum— | $ 6,240.00 |
| c. | Cassie Nelson— | $ 838.80 |
| d. | James Parson— | $10,597.60 |
| e. | Darlene Ross— | $ 478.40 |

The above-listed sums must be deducted from the amounts owed to these five Plaintiffs. Thus, Ms. Mathis' damages of $2,298.56 must be reduced by $522.40, so she is entitled to recover $1,776.16. Ms. Ross' damages of $2104.96 must be reduced by $478.40, leaving damages of $1626.56. Ms. Nelson is entitled to recover $1,597.04 ($2,435.84 minus $838.80 = $1,597.04). Ms. Mitchum and Mr. Parson are not entitled to any damages because their severance pay exceeded their back pay damages of $2,147.20 each.

Finally, Aircap is entitled to reduce its liability by "any wages paid by the employer to the employee for the period of the violation." 29 U.S.C. § 2104(a)(2)(A); *see United Steelworkers v. North Star Steel Co.,* 809 F.Supp. 5, 9 (M.D.Pa.1992), *aff'd in part, vacated in part,* 5 F.3d 39 (3d Cir.1993). Sixteen employees (who were stipulated to be class members) worked during the 60 days following June 17; therefore, Aircap may set off its liability to these Plaintiffs as follows:

1. John Caraway (A)
Before set-off:
Wages paid:

$ 7.50/hour × 44 days = $2640.00
$10.15/hour × 38 days = $3085.60
$ .00

2. Harmon Strange (A)
Before set-off:
Wages paid:

$ 7.50/hour × 44 days = $2640.00
$ 8.36/hour × 29 days = $1939.52
$ 700.48

3. Robin Barnes (B)
Before set-off:
Wages paid:

$ 7.50/hour × 44 days = $2640.00
$ 6.10/hour × 5 days = $ 244.00
$2396.00

4. Plaintiffs do not challenge the "voluntary and unconditional" nature of these payments and Air-cap's resulting entitlement to a set-off.

4.  Janice Carter (B)
    Before set-off:  $ 7.50/hour × 44 days = $2640.00
    Wages paid:      $ 6.10/hour ×  5 days = $ 244.00
                                             $2396.00

5.  Annie Moore (B)
    Before set-off:  $ 7.50/hour × 44 days = $2640.00
    Wages paid:      $ 6.10/hour ×  5 days = $ 244.00
                                             $2396.00

6.  Deborah Morris (B)
    Before set-off:  $ 7.50/hour × 44 days = $2640.00
    Wages paid:      $ 6.10/hour ×  5 days = $ 244.00
                                             $2396.00

7.  Thelma Benbow (C)
    Before set-off:  $ 7.50/hour × 44 days = $2640.00
    Wages paid:      $ 6.10/hour × 15 days = $ 732.00
                                             $1908.00

8.  Louvinia Brunson (C)
    Before set-off:  $ 7.50/hour × 44 days = $2640.00
    Wages paid:      $ 6.10/hour × 15 days = $ 732.00
                                             $1908.00

9.  Dorothy Conyers (C)
    Before set-off:  $ 7.50/hour × 44 days = $2640.00
    Wages paid:      $ 6.10/hour × 15 days = $ 732.00
                                             $1908.00

10. Mattie Conyers (C)
    Before set-off:  $ 7.50/hour × 44 days = $2640.00
    Wages paid:      $ 6.10/hour × 25 days = $1220.00
                                             $1420.00

11. Pearline Horace (C)
    Before set-off:  $ 7.50/hour × 44 days = $2640.00
    Wages paid:      $ 6.10/hour × 25 days = $1220.00
                                             $1420.00

12. Nolie Caldwell (A)
    Before set-off:  $ 7.54/hour × 44 days = $2654.08
    Wages paid:      $ 7.54/hour × 19 days = $1146.26
                                             $1507.82

13. Lee Murray (A)
    Before set-off:  $11.40/hour × 44 days = $4012.80
    Wages paid:      $11.40/hour × 37 days = $3374.40
                                             $ 638.40

14. Lawrence Odom (A)
    Before set-off:       $10.15/hour × 44 days = $3572.80
    Wages paid:           $10.15/hour × 15 days = $1218.00
                                                  $2354.80

15. Joe Adger (C)
    Before set-off:       $ 8.36/hour × 44 days = $2942.72
    Wages paid:           $ 8.36/hour × 24 days = $1605.12
                                                  $1337.60

16. Spencer Pearson (C)
    Before set-off:       $ 8.36/hour × 44 days = $2942.72
    Wages paid:           $ 8.36/hour × 33 days = $2207.04
                                                  $ 735.68

---

To summarize, the total damages due for back pay and insurance contributions, adjusted to reflect severance payments to five employees and wages paid to sixteen employees, are as follows:

| | |
|---|---|
| Subclass A | $ 40,057.66 |
| Subclass B | $369,935.80 |
| Subclass C | $197,073.33 |
| Total | $607,066.79 |

■ Plaintiffs also are entitled to recover the costs of this action and prejudgment interest from June 17, 1991. *Dillard Dep't Stores,* 15 F.3d at 1288–89; *North Star Steel,* 809 F.Supp. at 9. Federal courts take various approaches when establishing prejudgment interest rates; this court awards Plaintiffs prejudgment interest at the prevailing market rate from June 17, 1991 to the date of this order.

The WARN Act also provides that a prevailing plaintiff is entitled to a reasonable attorney's fee. 29 U.S.C. § 2104(a)(6). In light of the court's decision herein, counsel for Plaintiffs are instructed to submit their written petition for an award of costs and attorney's fees to the court within 20 days.

**C. *Aircap has not carried its burden of proving that it acted in good faith or that it had a reasonable belief that it was lawfully excused from giving 60 days' advance notice of its plant closing***

■ Section 2104(a)(4) of the WARN Act permits a court, in its discretion, to reduce liability if the employer "proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter." As the employer, Aircap bears the burden of proof as to this mitigation defense. Moreover, this defense must be narrowly construed. *Olsen v. Lake Country, Inc.,* 955 F.2d 203, 206 (4th Cir.1991) ("we recognize the general rule of construction that exemptions from remedial statutes are to be construed narrowly").

■ The legislative history of § 2104(a)(4) indicates that it was modeled on and should be interpreted in accordance with the case law under § 11 of the Portal-to-Portal Act, 29 U.S.C. § 260, which amended the Fair Labor Standards Act (FLSA). S.Rep. No. 62, 100th Cong. 1st Sess. at 24–25 (1987). Under the FLSA, an employee who proves a violation is entitled to unpaid compensation plus an equal amount as liquidated damages, and § 11 operates to relieve the employer only of its obligation to pay the liquidated damages portion. *Donovan v. Bel–Loc Diner, Inc.,* 780 F.2d 1113, 1118 n. 3 (4th Cir.1985). In interpreting § 11, courts have required a strong showing of efforts to comply with the FLSA. The employer must prove both that it acted in good faith and reasonably. *Mireles v. Frio Foods, Inc.,* 899 F.2d 1407, 1415 .(5th Cir.1990); *Joiner v. Macon,* 814 F.2d 1537, 1539 (11th Cir.1987). Good faith requires an honest intent to ascer-

tain the requirements of the statute and to act accordingly. *Dybach v. Florida Dep't of Corrections,* 942 F.2d 1562, 1566–67 (11th Cir.1991); *EEOC v. First Citizens Bank,* 758 F.2d 397, 403 (9th Cir.1985).

Accordingly, the WARN Act's good faith mitigation provision has been interpreted narrowly to require proof that the employer believed at the time of the plant closing that it was giving 60 days' notice or that it fit within one of the provisions allowing shortened or no notice. *Dillard Dep't Stores,* 15 F.3d at 1275; *United Steelworkers of America v. North Star Steel,* 817 F.Supp. 522 (M.D.Pa.1992); *Kayser–Roth Hosiery, Inc.,* 748 F.Supp. at 1292.

In *Dillard Dep't Stores,* the employer admitted it failed to provide plaintiffs the advance notice of termination required by the Act, but claimed it was still entitled to a reduction of damages for good faith. The employer, like Aircap, received legal advice regarding its employee terminations. Affirming the district court's rejection of the employer's argument, the Fifth Circuit noted that its managers knew of the Act's 60–day notice requirement, but that in interpreting the statute, they "consistently resolved any questionable issues in [the company's] favor." 15 F.3d at 1275 (5th Cir.1994). In this case, it is undisputed that Aircap management also knew the WARN Act applied to the terminations of Plaintiffs. In addition, as the *Dillard Dep't Stores* defendant resolved all questionable issues in its favor, Aircap also resolved all questionable issues in its favor.

The court is also persuaded by the decisions in *North Star Steel* and *Jones,* in which the employers treated their workers more generously than did Aircap, but the courts refused to allow a reduction in damages under § 2104(a)(4). North Star Steel did not seriously contest liability under the WARN Act, but asserted that it was entitled to a reduction in its liability for good faith. The district court reviewed an affidavit supplied by the employer stating that the plant was closed because of an electrical transformer failure and "poor market conditions." Defense counsel argued the company's actions were not "callous" and that economic circumstances placed the company in a "classic Catch–22 position." The court concluded that the employer's submission attempted to address the issue of subjective good faith, but there was no showing that the employer had objective reasonable grounds to believe that giving no notice was not a violation of the WARN Act. The court concluded that the employer's citing poor market conditions was not an acceptable substitute for proving reasonable grounds for believing it complied with the Act. Therefore, the court rejected the employer's good faith argument.

In *Jones,* the employer's good faith argument was based on its providing some notice of the plant's closing, keeping the plant open for much of the workforce for several months, granting severance pay to its employees, and making its usual United Way contribution. 748 F.Supp. at 1291. The court concluded the employer's conduct after the WARN Act violations was not relevant to determining good faith under the statute. *Id.* More importantly, the district court rejected the employer's argument that it gave notice within two days of the decision to close the plant. *Id.* at 1292. The court found the delay in giving notices, which occurred between the May 25, 1989 termination of the major customer's contract with the employer, and the customer's final rejection of the employer's plea to continue the contract on June 21, 1989, unreasonable. *Id.* In view of the employer's failure to provide any notice closer to the earlier date, the court found no basis for reducing the employer's liability for good faith. *Id.; see also Wholesale & Retail Food v. Santa Fe Terminal Services, Inc.,* 826 F.Supp. 326 (C.D.Cal.1993) (no good faith where employer delayed for six days giving of notice of mass layoff).

For all intents and purposes, the decision to close Aircap's Manning facility was made six weeks before the date of the closing. The minutes of the May 3, 1991 meeting of MTD's Board of Directors show that Aircap had more information for a longer period of time about its impending closing but gave even less notice to its employees than the employer in *Jones.*

Aircap's reliance on *Oil Workers v. American Home Prods.,* 790 F.Supp. 1441 (N.D.Ind.1992), and *UAW v. Shadyside*

*Stamping Corp.,* 6 IER Cas. 1640, 1991 WL 340191 (S.D. Ohio 1991), is not compelling. These cases illustrate the proper application of the "good-faith" defense where an employer substantially complied with the Act but committed certain technical violations. In *American Home Prods.,* the court concluded that an employer acted in good faith when it gave notice of a plant closing one year in advance and some workers learned of the quarter of the year in which they would lose their jobs much more than 60 days prior to the employment loss. The court found that technical defects in the notice did not defeat the defense of good faith because it was clear that the plant would close at the end of 1991. In *Shadyside Stamping Corp.,* the employer provided notice of an expected mass layoff five months in advance and subsequently gave a reminder notice. The contents of the notices contained technical defects, in that certain information was not provided. The court held that, in light of the fact that the interpretive rules prepared by the Department of Labor were generally not known at the time, the employer had proceeded in good faith in an attempt to properly notify employees of future layoffs.

Aircap advances basically three arguments in support of its contention that its liability should be excused, not just reduced, under Section 2104(a)(4). First, it asserts that its actions resulted from confusion as to the applicability of the WARN Act in connection with its normal seasonal layoff. Second, Aircap asserts that it reasonably believed the notice given on June 17, 1991 satisfied its WARN Act obligations. Third, it states that its good faith is evidenced by its consultation with legal counsel. Based on the evidence and applicable law, the court concludes that none of these assertions establish good faith and a reasonable belief that Aircap was in compliance with the Act.

As this court held in its Order dated August 30, 1993, the WARN Act does not contain a separate section or exemption for "seasonal" employees. The only possible exception to the notice requirement Aircap could

have argued was the "temporary" employee exemption; however, Plaintiffs clearly were not temporary employees. Aircap does not even contend that Plaintiffs were employed only for the duration of a particular project or undertaking, and it is undisputed that Aircap representatives never told Plaintiffs that they were temporary workers. In addition, all Plaintiffs were classified as "permanent" employees under Aircap's personnel policies. Accordingly, Aircap cannot establish any reasonable, objective belief that it was in compliance with a "seasonal" employee exemption, particularly since the statute does not contain such a provision.

In the August 30, 1993 Order, this court also rejected Aircap's position that its written notice given on June 17, 1991 was timely.[5] As this court held, the argument that notice given on the date of a mass layoff or plant closing is timely "is contrary to the clear language of the Act," which states that "[a]n employer shall not order a plant closing or mass layoff *until the end of a 60–day period after the employer serves written notice of such an order.*" 29 U.S.C. § 2102(a) (emphasis added). Under the WARN Act, it is clear that notice must precede the closing of the plant or mass layoff by 60 days. In light of the clear language of this statute, Aircap cannot establish that it reasonably and objectively believed it was in compliance with the WARN Act.

Moreover, the facts presented to the court demonstrate that Aircap's contentions must fail for several additional reasons. First, Aircap's representatives admitted that they could not testify that each Plaintiff would have been laid off for 60 days beginning on June 17, 1991, without the corporate decision to close the Manning plant. Based on the history of the facility, the court concludes that each Plaintiff would not have been laid off effective June 17, 1991 for a period of 60 days. In fact, Ted Moll, Vice President of Southern Operations of MTD, testified that the company never laid off skilled workers. Significantly, Defendant's officials also admitted during the hearing that prior to the

---

**5.** This argument does not address the 25 to 30 employees laid off on June 6, 1991 with no written notice.

announcement of the decision to close the Manning plant on June 10, 1991, no plans had been made to conduct a large scale layoff approximately seven days later. Further, of the 287 Plaintiffs involved in this litigation, approximately 100 were not laid off every year. In addition, the layoffs varied greatly in timing and duration, and apparently could occur as late as October or November, if at all.

The large number of employees working at the Aircap facility every summer also establishes that there was no mass exodus of workers each year. Aircap attempted to discount the significance of this fact by suggesting that snow throwers were being manufactured in prior years during the summer, but would not have been produced during the summer of 1991. As Rhomie Futch, general manager, testified, however, snow throwers were manufactured in the fall, beginning in August or later. Therefore, the production of snow throwers does not explain the large number of workers at the Aircap facility throughout each summer.

Finally, with respect to Aircap's claim that its good intentions are demonstrated by its consultation with legal counsel, the court notes that there is insufficient information in the record to determine the extent or nature of that consultation. The evidence is that Aircap and MTD management first consulted their legal counsel, who also was a member of the Board of Directors which voted to close the plant,[6] and his law partner, only seven days before implementing the decision, but weeks after the decision had effectively been made, and that the consultation apparently was brief, as it was described as a "stand-up" meeting. No written opinion was obtained, and the court has no evidence of the exact information given to the attorneys or whether it was even accurate. If Aircap provided erroneous information to its attorneys, the resulting advice would be affected. Aircap cannot state that it consulted with legal counsel and thereby insulate itself from liability for a clear violation of the WARN Act. Cf. Dillard Dep't Stores, 15 F.3d at

1275 (concluding that an employer which had consulted legal counsel did not establish its good faith mitigation defense). Without more evidence of the nature and extent of Aircap's consultation with counsel and the specifics of and basis for the legal opinion, the court cannot hold that Aircap carried its burden of proof. Moreover, Plaintiffs should not suffer if Aircap asked for and received informal legal advice that clearly is incorrect on the facts presented to the court.

Based on the evidence presented at the hearing, it is clear that Aircap treated this important matter very cavalierly. To hold that Aircap acted in good faith by obtaining an "off the cuff" oral opinion that directly affected the lives of 257 long term employees would eviscerate the purpose of the WARN Act.

## IV. CONCLUSION

Accordingly, it is

**ORDERED** that judgment be entered for Plaintiffs against Aircap Industries Corporation in the sum of six hundred seven thousand sixty six dollars and seventy nine cents ($607,066.79) plus prejudgment interest at the applicable market rate[7] from June 17, 1991 to the date of this Order and post-judgment interest at the legal rate from the date of the Order. Counsel for Plaintiffs are instructed to provide within 20 days a written petition with respect to their request for attorney's fees pursuant to 29 U.S.C. § 2104(a)(6).

**AND IT IS SO ORDERED.**

---

6. As noted above, the Board's decision took place on May 3, 1991. There was no evidence of any legal consultation between May 3 and June 10, 1991.

7. See Joye v. Heuer, 813 F.Supp. 1171, 1175 (D.S.C.1993).