# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

August 1, 2017

No. 16-10988

Lyle W. Cayce
Clerk

JOHNNY L. MEADOWS, On Behalf of Himself and All Others Similarly Situated,

Plaintiff–Appellant,

v.

LATSHAW DRILLING COMPANY, L.L.C.,

Defendant–Appellee.

Appeal from the United States District Court
for the Northern District of Texas

Before REAVLEY, OWEN, and SOUTHWICK, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Latshaw Drilling Co., LLC (Latshaw) terminated the employment of Johnny L. Meadows, who worked on one of its drilling rigs, and 397 other employees when a decrease in oil prices depressed demand for its services. Meadows filed suit on behalf of himself and others similarly situated, alleging that Latshaw, in violation of the Worker Adjustment and Retraining Notification Act of 1988 (WARN Act), conducted a plant closing or mass layoff without providing advanced notice. Meadows moved for class certification, and Latshaw moved for summary judgment. Before ruling on Meadows's class

No. 16-10988

certification motion, the district court granted Latshaw's motion for summary judgment.  Meadows has appealed.  We affirm.

**I**

Latshaw conducts its business by contracting with third parties, known as operators, to drill wells on lands the operators have leased.  Once Latshaw forms a contract with an operator, Latshaw "assembles a crew and a [drilling] rig" and moves the drilling rig to the project's location at the operator's expense.  Members of a crew work during one of two twelve-hour shifts.  The crew "work[s], eat[s], sleep[s], and live[s] at the [drilling] rig" for a fourteen day "hitch," and then a second crew replaces the first crew for the following fourteen days.  The first and second crews alternate in this pattern until the project is completed.  The crews travel to the drilling rig from their homes, sometimes over great distances, in their own vehicles.

Generally, each shift consists of a driller, a derrickhand, a motorhand, and two floorhands.  A rig manager oversees both shifts and "is responsible for all facets of the rig operation, including daily operating costs, profit[s], losses, [and] rig assets including inventory, supplies, safety, and personnel."   Daily assignments come from the rig manager and the operator's representative, who oversees the drilling project on the operator's behalf.  The operator's goals, the weather, the soil conditions, and the geology of the drilling location dictate how a drilling operation is conducted.

A crew may remain with the same drilling rig once the project has completed, moving with it to a new project's location or performing maintenance on their drilling rig at the "yard" where it is stored or, as the parties refer to it, "stacked."   Each drilling rig typically has twenty-two workers assigned to it at a time, although at times, a drilling rig has had as many as twenty-eight workers assigned.  A drilling superintendent, working

2

out of his or her vehicle, oversees approximately five drilling rigs for Latshaw, "frequently visit[ing] more than one drilling rig in a day."

However, as Latshaw's Operations Manager averred,

> [e]mployees often move around from well to well, shift to shift, and from hitch to hitch. It is also not uncommon for an employee to start one hitch at a particular [drilling] rig[,] and in the middle of that hitch be transferred over to another [drilling] rig where their particular expertise is needed.

The Operations Manager clarified that by "not uncommon," he means "that it is 'known' to occur." He also clarified that "[i]f a rig is stacked in the middle of a hitch, employees can be transferred to a new [drilling] [r]ig if work is available," but, he stated, "[a]t no time does an employee work for more than one [drilling] [r]ig or report to more than one supervisor." Meadows has declared, however, that he has "personally observed [his] co-workers at Latshaw change drilling rig assignments on a regular basis."

Generally, if a drilling rig needs a part, the part is ordered from a third-party vendor and charged to the drilling rig. However, if a third-party vendor cannot provide the part in time, a spare of that part can be obtained from another of Latshaw's drilling rigs. According to Meadows, "equipment was . . . regularly shared amongst Latshaw's different drilling rigs." In the event that a part for a drilling rig was obtained from another drilling rig, the Latshaw accounting department would charge the cost of the part to the second drilling rig.

Latshaw's corporate office is in Tulsa, Oklahoma, and it has three yards, which contain extra equipment and stored drilling rigs, located, respectively, in Stillwater, Oklahoma; Broken Arrow, Oklahoma; and Midland, Texas. "Rig employees are not assigned to, do not report to, and do not work out of the Tulsa [corporate] office." The corporate office, each yard, and each rig are "cost centers."

No. 16-10988

Preceding this litigation, Latshaw had thirty-nine drilling rigs, which it had used in project locations spread across Texas, New Mexico, Oklahoma, Arkansas, and Kansas.  As oil prices began to drop, fewer operators requested Latshaw's services.  Latshaw started stacking its drilling rigs—ultimately stacking twenty-nine of its thirty-nine drilling rigs—and, without advanced written notice, began laying off its employees.  Over approximately six months, Latshaw laid off 398 employees, including Meadows.

Meadows filed suit on behalf of himself and others similarly situated, claiming that Latshaw violated the WARN Act[1] by ordering a mass layoff or plant closing at a single site of employment without sixty days' written notice. He alleged four alternative theories for the composition of the "single site of employment" requirement: (1) Latshaw's "drilling rigs are collectively a single site of employment as they operate in a limited geographic area, are used for the same purpose of facilitating the drilling of wells, and share the same employees and equipment amongst the various drilling rigs," (2) the "Tulsa Headquarters constituted a single site of employment," (3) Latshaw's employees "worked at a single site(s) of employment in connection with a truly unusual organizational situation," or (4) "each drilling rig operating at/from/through [the] relevant single site of employment for [Meadows] and the Class Members constitutes/constituted an operational unit within such single site of employment."  Meadows moved for class certification.

Before the court had ruled on class certification, Latshaw moved for summary judgment, asserting that "each Latshaw [drilling] rig, each yard, and the Latshaw Drilling corporate office were separate sites of employment . . . that . . . may not be treated collectively as one single site of employment under the WARN Act."  Because these sites each had less than

---

[1] 29 U.S.C. §§ 2101-2109.

fifty employees, Latshaw claimed that "neither a 'plant closing' nor a 'mass layoff' could have occurred." The district court granted Latshaw's motion, concluding that Meadows had failed to raise a genuine dispute of material fact as to whether there had been an employment loss for at least fifty people within the requisite period at a single site of employment. In so doing, the district court addressed what Meadows considers distinct theories of liability that, he argues, Latshaw had not addressed in its summary judgment motion. Meadows appeals.

## II

The WARN Act requires that before an employer with 100 or more full-time employees orders a "plant closing"[2] or "mass layoff,"[3] the employer must provide sixty days' written notice to "each affected employee" and certain state officials.[4] A plant closing occurs when an employer permanently or temporarily closes "a single site of employment, or one or more facilities or operating units within a single site of employment," resulting in an employment loss for at least fifty employees over a thirty-day period.[5] A mass layoff occurs when an employer reduces its work force at a "single site of employment" during a thirty-day period by at least fifty employees, an amount which must also constitute at least thirty-three percent of its workforce at that single site of employment.[6] If two or more groups of employees (each less than fifty employees) at a single site of employment experience employment loss aggregating to fifty or more employees within any ninety-day period, then, subject to limited exception, a plant closing or mass layoff has occurred.[7] An

---

[2] 29 U.S.C. § 2101(a)(2).
[3] *Id.* § 2101(a)(3).
[4] *Id.* § 2102(a).
[5] *Id.* § 2101(a)(2).
[6] *Id.* § 2101(a)(3).
[7] *Id.* § 2102(d).

employer that fails to provide the required notice "is liable for back pay, lost benefits, civil penalties, and attorney['s] fees."[8]

Although the WARN Act does not define a "single site of employment," the Department of Labor (DOL) has provided regulatory guidance. The general rule is that "separate facilities are separate sites."[9] A "narrow" exception to this general rule is that "geographically separate sites" with "an inextricable operational connection"—that is, separate sites that "are used for the same purpose and share the same staff and equipment"—can constitute a single site of employment.[10] As this court has noted, "two plants across town will rarely be considered a single site."[11]

The regulations provide more specific definitions of a "single site of employment." 20 C.F.R. § 639.3(i)(3) states that "[s]eparate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment." For example, "an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees from one building to another" operates a single site of employment even though the buildings are not connected or immediately proximate.[12] Conversely, 20 C.F.R. § 639.3(i)(4) states that "[n]on-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single

---

[8] *Viator v. Delchamps Inc.*, 109 F.3d 1124, 1127 (5th Cir. 1997); *accord* 29 U.S.C. § 2104.

[9] *Davis v. Signal Int'l Tex. GP, L.L.C.*, 728 F.3d 482, 485 (5th Cir. 2013) (quoting Worker Adjustment and Retraining Notification, 54 Fed. Reg. 16042-01, 16050 (Apr. 20, 1989)).

[10] Worker Adjustment and Retraining Notification, 54 Fed. Reg. 16042-01, 16049 (Apr. 20, 1989)).

[11] *Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 934 (5th Cir. 1994).

[12] 20 C.F.R. § 639.3(i)(3).

site."[13]  As a result, "assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers."[14]

The regulations also clarify, in 20 C.F.R. § 639.3(i)(6), that "workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons)" are covered under the WARN Act.[15]  For these types of employees, the relevant single site of employment is "the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report."[16]  Finally, 20 C.F.R. § 639.3(i)(8) clarifies that "[t]he term 'single site of employment' may also apply to truly unusual organizational situations" if the other regulatory definitions "do not reasonably apply."  The DOL included this last definition "to maintain some flexibility in the definition of 'single site of employment.'"[17]

Meadows asserts that the district court erred in concluding that he had not established a genuine issue of material fact precluding summary judgment as to whether any of Latshaw's drilling rigs together constituted a single site of employment as defined in 20 C.F.R. § 639.3(i)(3).  He also asserts that the district court erred in addressing his "plant closing" theory and his alternative theories of a single site of employment that were based on 20 C.F.R. § 639.3(i)(6) and 20 C.F.R. § 639.3(i)(8) because Latshaw, Meadows argues, did not raises those theories in its summary judgment briefing.

---

[13] *Id.* § 639.3(i)(4).

[14] *Id.*

[15] *Id.* § 639.3(i)(6).

[16] *Id.*

[17] Worker Adjustment and Retraining Notification, 54 Fed. Reg. 16042-01, 16050 (Apr. 20, 1989).

No. 16-10988

**A**

Section 639.3(i)(3) allows the aggregation of geographically distinct facilities into a single site of employment for purposes of the WARN Act only if: "1) the separate facilities are in 'reasonable geographic proximity' of one another; 2) they are 'used for the same purpose'; 3) and they 'share the same staff and equipment.'"[18] The district court determined that Meadows had not presented evidence to create a genuine dispute of material fact that any drilling rigs that together suffered employment losses sufficient to trigger the WARN Act were in reasonable geographic proximity.[19] Reviewing the district court's judgment de novo,[20] we agree.

In his briefing, Meadows argues that he presented an affidavit in which he stated that "it was common for a drilling superintendent to visit all drilling rigs he managed in a given day," which typically amounted to five drilling rigs, and "that drilling rigs were frequently close enough for [an employee] to retrieve a part from another drilling rig if 'they couldn't get a hold of anybody till in the morning.'"

As a preliminary matter, Meadows's briefing mischaracterizes the record. Meadows never stated that it was common for a drilling superintendent to visit all the drilling rigs that he or she managed in a single day; instead, he testified that "[d]rilling superintendents frequently visited more than one drilling rig in a day." In any event, Meadows has not identified

---

[18] *Viator v. Delchamps Inc.*, 109 F.3d 1124, 1127 (5th Cir. 1997) (quoting 20 C.F.R. § 639.3(i)(3)).

[19] *See In re La. Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017) ("[W]here the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the [nonmovant] the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Only when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party' is a full trial on the merits warranted." (first alteration in original) (quoting *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994))).

[20] *Id.*

specific facts showing that there is a genuine dispute for trial. As the district court noted, Meadows has shown merely that "an unspecified number of job sites are located an unspecified distance from each other somewhere within an area that is approximately 250 miles wide and 300 miles long." He has not pointed to any grouping of job sites in which, between the sites, Latshaw laid off fifty or more employees within the relevant WARN Act period. His attempt to create a single site of employment by grouping "drilling rigs managed by a single drilling superintendent" does not cure this evidentiary deficiency, nor does his conclusion that "common management has been held sufficient to bind as many as eight discrete sites together as one single site of employment." As is evident in the unpublished, out-of-circuit case he cites for this proposition, common management is relevant to whether multiple locations can be aggregated to form a single site of employment, but it is not, standing alone, sufficient.[21]

To the extent that he attempts to group the drilling rigs by the oil basins in which they drill, he has not provided any support for this proposition. Regardless, aggregating an unspecified number of drilling rigs in a basin 250 miles wide by 300 miles long—that is, a basin covering 75,000 square miles— and spread across two states, would be inconsistent with our court's observation that "two plants across town will rarely be considered a single site."[22]

Meadows blames his inability to specify the drilling rigs' locations on Latshaw, stating that Latshaw provided evasive responses to Meadows's

---

[21] *Gorini v. AMP Inc.*, 94 F. App'x 913, 920-21 (3d Cir. 2004) (observing that "the buildings were close together"—in fact "in multiple contiguous, connected . . . facilities"— "and shared employees, job functions, and services"); *see also* 20 C.F.R. § 639.3(i)(4) ("[A]ssembly plants which are located on opposite sides of a town and *which are managed by a single employer* are separate sites if they employ different workers." (emphasis added)).

[22] *Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 934 (5th Cir. 1994).

interrogatories. He claims that "the district court should have withheld its decision on summary judgment and allowed Meadows to complete discovery on a class basis." The district court's failure to withhold its decision, Meadows maintains, constituted reversible error because it "require[d] Meadows to put on evidence of information which only Latshaw could [have] know[n] . . . [and] then penalize[d] him for not doing so where Latshaw refused to produce the requested data."

Federal Rule of Civil Procedure 56(d) provides that when facts are unavailable to the nonmovant and the nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to the summary judgment motion, a district court may "defer considering the motion or deny it," "allow time to obtain affidavits or declarations or to take discovery," or "issue any other appropriate order."[23] In other words, it provides the process for a nonmovant to request a district court to withhold its decision on summary judgment. Although we have recognized that a nonmovant's "failure to tailor its request for additional discovery to fit [the rule's] precise measurements does not necessarily foreclose the court's consideration of the request," the nonmovant must nevertheless request a continuance for additional discovery to obtain it.[24] Indeed, the nonmovant "must indicate to the court by some statement, preferably in writing[,] . . . why

---

[23] FED. R. CIV. P. 56(d).

[24] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1266 (5th Cir. 1991); *see also Potter v. Delta Air Lines, Inc.*, 98 F.3d 881, 887 (5th Cir. 1996) (holding that the plaintiff "is foreclosed from arguing that she did not have adequate time for discovery" because she did not move for a continuance); *see also* FED. R. CIV. P. 56 advisory committee's note to 2010 amendment (noting that "[s]ubdivision (d) carries forward without substantial change the provisions of former subdivision (f)").

he needs additional discovery and how the additional discovery will create a genuine issue of material fact."[25]

It is undisputed that Meadows never moved for or requested a continuance for the purpose of obtaining this evidence. Meadows requested two unopposed extensions to the summary judgment briefing deadline, both of which the district court granted, while discovery was still ongoing, yet he never sought the evidence that he now claims he needed. Because Meadows did not file a motion, request a continuance, or state that he needed the evidence he now believes is necessary, the district court properly ruled on the summary judgment motion.

Meadows has not presented any genuine dispute of material fact as to the reasonable geographic proximity requirement of 20 C.F.R. § 639.3(i)(3). It is insufficient to assert that "the evidence [was] likely to be within the possession of [Latshaw]";[26] Meadows had a full opportunity to conduct discovery but did not "present affirmative evidence in order to defeat a properly supported motion for summary judgment."[27] The district court correctly entered summary judgment on this issue.

**B**

Federal Rule of Civil Procedure 56(f)(2) states that "[a]fter giving notice and a reasonable time to respond, the court may . . . grant the [summary judgment] motion on grounds not raised by a party." This court has concluded that "[s]ummary judgment is improper if '[t]here was no reason for the

---

[25] *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1442 (5th Cir. 1993) (emphasis omitted).

[26] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

[27] *Id.*

[nonmoving party] to suspect that the court was about to rule on the motion.'"[28] That is, the basis for the district court's decision must be "raised in a manner sufficient to make the nonmoving party aware that failure to present evidence on the issue could be grounds for summary judgment."[29]  Meadows argues that the district court should not have reached the merits of his plant-closing claim or the merits of his other articulations of a single site of employment because they were not raised in Latshaw's summary judgment motion.  We disagree.

In its summary judgment briefing, Latshaw cited 29 U.S.C. § 2101(a)(2), defining "plant closing," and 29 U.S.C. § 2101(a)(3), defining "mass layoff."  It explained that "neither a 'plant closing' nor a 'mass layoff' could have occurred[,] as each [drilling] rig and the [corporate] office are considered to be a 'single site of employment.'"  Latshaw identified that a plant closing and a mass layoff both depend on the meaning of a single site of employment and argued that "under a plain reading of the statute, the regulatory guidance, and the existing body of case law, it is clear that the [drilling] rigs should not be treated collectively as one single site of employment."  Latshaw also cited 20 C.F.R. § 639.3(i) and stated that "[t]he plain reading of these regulations support[s] the conclusion that each Latshaw [drilling] rig, each yard, and the corporate office were separate sites of employment."  Throughout its brief, Latshaw asserted that its drilling rigs, three yards, and corporate office were each single sites of employment.  Latshaw sought a take-nothing judgment and requested that the district court "dismiss [Meadows's] claims against Defendant, with prejudice."

---

[28] *Atkins v. Salazar*, 677 F.3d 667, 678 (5th Cir. 2011) (per curiam) (alterations in original) (quoting *Resolution Tr. Corp. v. Sharif-Munir-Davidson Dev. Corp.*, 992 F.2d 1398, 1402 (5th Cir. 1993)).

[29] *Id.* at 679 n.16 (quoting *Loughman v. Sw. Bell Tel. Co.*, 131 F.3d 140, 1997 WL 759294, at *3 (5th Cir. Oct. 28, 1997) (per curiam) (unpublished)).

No. 16-10988

At the least, Latshaw's summary judgment briefing should have put Meadows on notice that he "had to come forward with all of [his] evidence."[30] Latshaw raised in its summary judgment motion that neither a mass layoff nor plant closing had occurred because no single site of employment had suffered an employment loss of fifty or more people. Latshaw even stated that "[t]he plain reading of [20 C.F.R. § 639.3(i)]," defining a single site of employment, warranted summary judgment. The district court did not err in awarding complete summary judgment dismissing Meadows's case in its entirety.

## C

Meadows constrained his briefing on appeal to the two issues addressed above—that is, to whether Latshaw's drilling rigs may be aggregated as a single site of employment as defined by 20 C.F.R. § 639.3(i)(3) and whether the district court entered summary judgment on a ground not raised in Latshaw's summary judgment briefing. Meadows has not argued the merits of whether drilling rigs are operational units within a single site of employment within the meaning of 20 C.F.R. § 639.3(b) with respect to his plant closing theory, whether Latshaw's employees are outstationed employees within the meaning of 20 C.F.R. § 639.3(i)(6), or whether Latshaw is a "truly unusual organizational situation[]" within the meaning of 20 C.F.R. § 639.3(i)(8). Instead, he asserts that he "*could* have presented evidence" to the district court regarding his plant closing theory and outstationed employee construction of the case had he had "notice and opportunity to brief th[ese] alternative theor[ies] of liability" and that "a case of first impression" that involves a large amount of people "losing their jobs further warrants consideration of the truly unusual organizational situation provision." Because he has not presented

---

[30] *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).

13

No. 16-10988

evidence or briefed the application of these theories on appeal, we do not disturb the district court's judgment that Meadows did not present a genuine dispute of material fact with respect to these conceptions of the case.[31]

\* \* \*

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[31] *See Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009) (noting that "claims . . . not briefed on appeal . . . [are] waived." (alterations in original) (quoting *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 408 (5th Cir. 2008))).